The relator since a time prior to 1907 has owned and operated a double-track surface electric railroad between the city of Syracuse and the city of Rochester. Its road passes through the town of Montezuma, Cayuga county, a distance of 2.55 miles. In 1907 the relator's road in said town was and since that time, except as hereinafter stated, has been maintained upon lands privately owned by it. In September, 1907, an accurate survey and map of six hundred and fifty feet in length of the relator's lands in said town so occupied by its road, including the whole width thereof, was made by the state engineer, to which he attached his certificate that the the lands described therein "Had been permanently appropriated for the use of the improved Erie Canal." Such map, survey and certificate were made as provided by chapter 147 of the Laws of 1903, as amended *Page 117 
by chapter 365 of the Laws of 1906, and they were duly filed as provided by the statute. On September 30, 1907, the superintendent of public works served upon the relator the notice as also provided by said statute. The statute as it then existed expressly provides that: "From the time of the service of such notice, the entry upon and the appropriation by the state of the real property therein described for the purposes of the work and improvement provided for by this act, shall be deemed complete, and such notice so served shall be conclusive evidence of such entry and appropriation, and of the quantity and boundaries of the lands appropriated."
Thereafter the relator moved its tracks and accompanying overhead electric construction from the lands so appropriated and with a part of the same built a single track with other construction on lands around the piece of land so appropriated for a temporary detour and used the same in its railroad transportation business until some time in the year 1911.
On the 10th day of June, 1910, the state of New York, pursuant to statute (Chapter 195 of the Laws of 1908, as amended by chapter 334 of the Laws of 1910), entered into an agreement with the relator which recited the appropriation of its real property as hereinbefore described and that the relator had been damaged and was legally entitled to compensation therefor and provided for and on behalf of the state of New York as the party of the first part, and the relator as the party of the second part as follows:
"First. The party of the first part agrees to pay upon the conveyance by warranty deed of a good and marketable title to the aforesaid property, as hereinafter provided, the sum of Eighty-two thousand seven hundred forty-eight and 64/100 ($82,748.64) dollars in the manner and form provided by Chapter 195 of the Laws of 1908 and amendments thereof, which sum is computed and *Page 118 
set out in detail in a schedule hereto attached and marked `Exhibit A.'
"Second. The party of the first part agrees that the State of New York will through its proper officers and representatives, grant to the party of the second part a permit to use and occupy the said lands shown on the annexed appropriation map as aforesaid, such permit, however, to be in all respects subject to the provisions of Section 35 of Chapter 5 of the Consolidated Laws as far as applicable, but such permit shall be revocable whenever the free and perfect use of the canal may so require. The revocation of such permit, however, shall be without prejudice to the right of the said party of the second part, its successors or assigns, to receive compensation therefor, in a sum equivalent to the damage caused thereby, which sum is not included in this agreement.
"Third. The party of the second part agrees to convey on or before the 15th day of August, 1910, to the people of the State of New York and to deliver to the Comptroller of the State of New York a warranty deed conveying a good and marketable title to the lands, structures and waters described in and shown upon the annexed appropriation map attached hereto and made a part hereof, and marked `Exhibit B.'
"Fourth. The party of the second part agrees to accept the aforesaid permit to use and occupy the aforesaid lands, as hereinbefore provided, and agrees to construct and maintain over the said lands, subject, however, to all of the terms and conditions of this agreement, its tracks and structures in accordance with the plans shown upon a map entitled `Rochester, Syracuse Eastern Railroad, Proposed Barge Canal Crossing near Montezuma, N.Y.' dated March 29, 1910, which map is hereto annexed and made a part hereof and marked `Exhibit C.' *Page 119 
"Fifth. The party of the second part hereby agrees to accept the payment of money as aforesaid and to carry out the provisions of this agreement in full settlement of any and all claims of any nature whatsoever arising out of the appropriation and use as herein provided by the State of New York of any and all of the lands, structures and waters herein referred to and shown upon the annexed appropriation map."
It is unnecessary in determining the question before us to include herein the exhibits mentioned in the agreement. The work required as provided by the agreement included making excavations in which to erect two concrete piers or abutments across said real property, and the erection of said piers or abutments two hundred and fifty-three feet apart and at a height as directed by the state; and the erection thereon of a steel bridge on which the relator's road could be built and maintained; and it also included raising the grade of the lands at either end of said bridge to make suitable access thereto and also the necessary electric construction to restore to the relator the use of said six hundred and fifty feet of land upon the raised grade or embankment and over said bridge.
The bridge and other work were completed by the relator in accordance with the agreement and the state then excavated between the piers or abutments and constructed the improved Erie canal under said bridge.
After the completion of said work the piers or abutments became in part the outer walls of the canal and the relator has since used said embankments and said bridge as a part of its road between said cities.
In 1911 the respondents, as assessors of the town of Montezuma, assessed the relator for all of said 2.55 miles of land in their town including therein said six hundred and fifty feet so taken by the state, at the sum of $100,000. *Page 120 
The respondents deny that the relator is assessable for a special franchise over said six hundred and fifty feet of land, but insist that said land is assessable by them as such assessors because the relator has, as alleged by them, a perpetual easement therein. This proceeding was commenced by a writ of certiorari to review the assessment so made by the respondents. The assessment has thus far been sustained. The determining question before us is whether the relator uses and occupies said six hundred and fifty feet of land because of a special franchise from the state, or as the owner of a perpetual easement therein.
The state engineer and surveyor is authorized to determine not only the lands, structures and waters, but also the estate or interest therein required for the use of the improved canals. (People ex rel. N.Y.C. H.R.R.R. Co. v. Walsh, 211 N.Y. 90,98.)
If a perpetual easement and not the fee of the land is to be appropriated it should be so stated in the notice. (People v.Fisher, 190 N.Y. 468, 478.) The state engineer is authorized to take such lands, structures and waters as shall in his judgment be necessary for the use of the improved canals. The lands of the relator were in this case taken as a permanent appropriation. The lands so appropriated were designed for and actually used in the location and construction of the improved canal. The state became the owner of the fee of the land appropriated. (People v.Fisher, supra.) Such appropriation resulted in a complete severance of the relator's roadbed. It was not only severed by the unqualified appropriation of a part of the relator's real property on which its tracks and other property used therewith were situated but the improved canal was constructed across such real property. The relator's right of occupancy of the real property so taken was included in the permanent appropriation.
The state did not appropriate a right to build its canal over the relator's land but took the land described in *Page 121 
the survey absolutely and unconditionally free from all rights of the relator therein. The agreement provides for the payment of an amount for certain specified uses. It does not purport to adjust or settle the damages occasioned by the complete severance of the relator's road between said cities but holds such damages in abeyance unsettled and unadjusted. It gives to the relator a revocable license to use the lands of the state so appropriated as therein provided. So long as such license remains unrevoked the question of damages by reason of such severance as stated other than as included in the payment for specified uses is left for future adjustment.
From the making of said agreement the relator's right to use and occupy the six hundred and fifty feet is defined by the agreement and consists of a revocable license which constitutes a special franchise.
The canal lands owned by the state are a "public place" within the meaning of the Tax Law (Subdivision 3, sec. 2), and the crossing of said lands by the tracks of a railroad is a special franchise and taxable as such. (People ex rel. N.Y.C. H.R.R.R.Co. v. Woodbury, 167 App. Div. 535; affd., 216 N.Y. 651.)
It does not change the legal rights of the parties if the state in preference to adjusting all the damages of the relator for the severance of its road at once, concludes to continue the license indefinitely. The relator's occupancy continues a franchise and nothing more. It is not necessary in this opinion to discuss the rights or ownership, if any, of the relator in the bridge and other property placed by it pursuant to the agreement upon the lands taken by the state. Whatever tangible property, if any, the relator has situated in, upon, under or above the six hundred and fifty feet of land now owned by the state must be "taxed as a part of the special franchise." (Tax Law, § 2.) *Page 122 
The respondents claim that the decision of this court inPeople ex rel. N.Y.C. H.R.R.R. Co. v. Woodbury (203 N.Y. 167) sustains their position. The facts in that case are entirely different from the facts in the case now before us. In that case the railroad company owned and occupied lands in the city of Buffalo for its roadway. The city did not take from the railroad company the ownership of the land on which it maintained its road, but acquired a right to build and maintain one or more of its streets over the same. It was held that the railroad company did not obtain a license or franchise to cross the defendant's streets but that the city obtained a right to build and maintain its streets over the lands of the railroad company, subject to the underlying right of the railroad company to maintain its railroad thereon. In that case the railroad company retained an easement in the land. It did not become a licensee but continued to maintain its road on such lands as of right and not by permission of the state or the municipality. In the case now before us, as we have seen, the state obtained by appropriation and by deed from the railroad company the full and complete ownership of the real property described and the railroad company occupies the lands of the state pursuant to the agreement. In theN.Y.C. H.R.R.R. Co. case last cited the court say: "A street crossing franchise consists of the right to lay tracks across a street and use them, when but for a grant of the right to do so from competent public authority it would be a trespass. (Peopleex rel. Met. St. R'way Co. v. State Board of Tax Comrs.,174 N.Y. 417, 435.) The franchise is created by grant and cannot be acquired by purchase or condemnation." (p. 176.)
In that case, referring to the street crossings under consideration, the court further say: "As the relator owned its right of way it had all it could get and all that it needed. No grant of a special franchise was necessary *Page 123 
and never became necessary, for it built its road on its own private right of way. It did not cross an existing street, but a new street came to it and crossed its tracks, thereby adding a burden but conferring no benefit. Instead of the plaintiff having an easement to cross the street the street has an easement to cross the railroad." (p. 178.)
The decision in People ex rel. L.I.R.R. Co. v. State Bd. ofTax Commissioners (148 App. Div. 751) was affirmed in this court (207 N.Y. 683) on the opinion of the late Justice BURR delivered in the Appellate Division. In that case the interest of the relator in the lands then under consideration is described and defined by the said justice as follows (p. 753): "It must now be deemed to be settled that the interest of relator in said strip is accurately described as `the exclusive right to use and occupy the thirty foot strip forever for the purpose of railroad tracks and turnouts and running locomotives and cars thereon without interruption or molestation,' which right is in the nature of an easement. (Long Island R.R. Co. v. City of New York, supra.)" The relator in that case had a right in the strip of land described in the nature of an easement.
Our attention has also been called to the decision in Peopleex rel. Erie R'way Co. v. Beardsley (52 Barb. 105, 107). In that case although the relator did not acquire a fee in the land of the Seneca Nation of Indians upon which its road was constructed, it did acquire a right therein under chapter 316 of the Laws of 1836 "to make its road upon Indian lands." The right of occupancy was not restricted except that it could not be for "Any purposes other than what may be necessary for the construction, occupancy and maintenance of such railroad." The relator's right, in that case, was properly assessed by the town assessors.
The respondents were wrong in assessing the 2.55 *Page 124 
miles of land over which the relator's road is maintained, with the tracks and bridges thereon, without excepting therefrom the six hundred and fifty feet taken by the state. The relator has a special franchise over such six hundred and fifty feet which should be assessed as such.
The respondents ask that the appeal be dismissed because the notice of appeal to this court is in terms from a judgment and not from a final order of the Appellate Division.
This is a special proceeding, and not an action. In a special proceeding the determination of the court should be by a final order in the proceeding. The word "judgment" refers to a civilaction. (Code of Civil Procedure, sec. 3343, subd. 20.) On the determination of this proceeding in the Special Term an order was entered on motion of the attorney for the respondents, stating such determination of the court, and on such order a further order, denominated a judgment, was entered, also on motion of the attorney for the respondents. The appeal to the Appellate Division by the relator was from the order and the alleged judgment, and the Appellate Division entered an order "That the judgment and order so appealed from be and the same hereby are affirmed, with costs." On such order a further order denominated "Judgment of the Appellate Division Supreme Court," was entered in the county clerk's office, also on motion of the respondents' attorney. It ordered and adjudged as in the previous order that "The judgment and order appealed from be and the same hereby are affirmed," and further ordered and adjudged that the respondents recover of the appellant "The sum of eighty-five ($85) dollars costs and disbursements and that they have execution therefor."
The appellant in taking the appeal to this court recited in the notice of appeal the order denominated a "Judgment of the Appellate Division, Supreme Court." *Page 125 
It is the duty of the clerk of the court to insert in the judgment or final order the amount of costs as taxed. (Code of Civil Procedure, sec. 3262.) It is not necessary to enter a new and amended order or judgment for the purpose of including the amount of costs therein after the same are so taxed. The respondents now object to the appellant recognizing or considering the amended order or judgment so entered in their behalf on motion of their attorney. We do not think that the appeal should be dismissed by reason of the particular recital in the notice of appeal as stated, but that the so-called judgment should be treated as an amended final order of the Appellate Division in the proceeding and the appeal as from such amended final order.
The Special Term of the Supreme Court found: "The fair and true value of relator's property assessable as real estate in the town of Montezuma, N.Y. * * * on the first day of July, 1911, exclusive of the 650 foot strip, was $102,287.56." And it also found that "The assessors of the town of Montezuma assessed the real property in said town exclusive of relator's property in the year 1911 at only 66.5164 of its full or fair market value."
As there seems to be no dispute about the valuation and percentage as stated in said findings a new trial of the proceeding is unnecessary.
The orders of the Special Term and of the Appellate Division should be reversed and the proceeding remitted to the Special Term with directions to fix the valuation of the relator's property in the town of Montezuma, not including its special franchise therein, at $102,287.56 and equalize the same at 66.5164 per cent thereof, with costs in all courts.
HOGAN, POUND, McLAUGHLIN, CRANE and ANDREWS, JJ., concur; HISCOCK, Ch. J., not sitting.
Orders reversed, etc. *Page 126