The People of the State of New York ex rel. Western New York and Pennsylvania Railway Company, Respondent, *v.* Walter H. Knapp and Others, as Tax Commissioners of the State of New York, and Constituting the State Tax Commission of the State of New York, Appellants.

Third Department, June 27, 1924.

Taxation — special franchise tax — certiorari to review assessments — State appropriated lands of relator for Barge canal — appropriation did not specify title — State agreed in settlement of damages to give quitclaim deed of easement to relator and executed deed — State acquired title in fee under Barge Canal Act (Laws of 1903, chap. 147, § 4, as amd. by Laws of 1908, chap. 196) by filing map and survey and service of notice — agreement by State to grant easement made in settlement of damages under Laws of 1915, chap. 448, not effective as such — in view of Canal Law, § 35, and Railroad Law, § 24, said agreement and deed granted special franchise within Tax Law, § 2, subd. 6 — oral agreement by State officers cannot lessen title which map and survey defined — agreement subsequently made arising out of dispute as to title not controlling — map subsequently filed purporting to release easement not effective — portion of abandoned canal lands which State reserved in grant to relator's predecessor and subsequently restrained predecessor from using is in State in fee — in view of subsequent application of relator's predecessor to use said land relator is estopped from denying its use constitutes special franchise.

The State acquired the title in fee to lands appropriated for the Barge canal by filing under section 4 of the Barge Canal Act, chapter 147 of the Laws of 1903, as amended by chapter 196 of the Laws of 1908, a map and survey of the lands taken and the service of notice upon the owner, notwithstanding the notice did not specify the particular title appropriated.

An agreement entered into by the officers of the State in settlement of damages under chapter 448 of the Laws of 1915 for lands of the relator appropriated by the State for Barge canal purposes, whereby the State agreed to give a quitclaim deed of the easement to use and occupy the lands so appropriated for railroad purposes and a deed executed and delivered under that agreement, did not operate, in view of section 35 of the Canal Law and section 24 of the Rail-

road Law, to transfer an easement in the land, but granted merely a privilege or franchise within subdivision 6 of section 2 of the Tax Law, and, therefore, the crossing by the railroad of the Barge canal constituted a special franchise subject to assessment.

An oral agreement entered into by State officers relating to lands to be appropriated for the Barge canal did not operate to limit the title which the maps and survey defined, which was all the right, title and interest of every kind and nature, legal or equitable, of the relator in the land and neither did an agreement entered into after the appropriation was made nor a map subsequently filed purporting to release out of the property appropriated an easement to use and occupy the premises referred to for railroad purposes operate to cut down the State's title, and the use of the lands by the railroad after the appropriation constitutes a special franchise subject to assessment.

The State holds title in fee to a portion of the lands formerly used for the Genesee Valley canal, since it appears that in a deed transferring the lands to relator's predecessor, the State reserved the portion in question, and, furthermore, it thereafter restrained relator's predecessor from using that portion for railroad purposes, and, being the owner in fee at the time an application was made by relator's predecessor in title to use the canal lands for railroad purposes, the relator is estopped from now asserting that its railroad is not operated under the permission granted its predecessor and that it is not now exercising a special franchise in relation to the premises with which the permission deals and such special franchise is subject to assessment.

COCHRANE, P. J., dissents in part.

APPEAL by the defendants, Walter H. Knapp and others, as Tax Commissioners, etc., from a judgment of the Supreme Court in favor of the relator, entered in the office of the clerk of the county of Albany on the 14th day of May, 1923, upon the report of a referee appointed to hear and determine the whole issues in a certiorari proceeding to review special franchise assessments made against it in the city of Rochester, N. Y., for the year 1920.

*Carl Sherman, Attorney-General* [*John M. Farrell* and *George B. Draper, Deputy Attorneys-General*, of counsel], for the appellants.

*Frank Rumsey*, for the respondent.

H. T. KELLOGG, J.:

This appeal tests the validity of special franchise tax assessments made against relator for two Barge canal crossings known as the Gates-Rochester crossing and the Chili-Rochester crossing. It, also, involves an assessment on account of the relator's occupation of a part of the abandoned Genesee Valley canal.

*The Gates-Rochester Barge canal crossing.* The Genesee Valley Terminal Railroad Company, the predecessor in title of the relator, in the year 1882 acquired title in fee simple to certain premises in the town of Gates, Monroe county. It soon after laid its railway tracks upon the premises and began to operate its trains thereover into the city of Rochester. A railroad has ever since

762   People ex rel. Western N. Y. & Penn. R. Co. *v.* Knapp.

Third Department, June, 1924.        [Vol. 209

been operated upon the premises by the Genesee Valley Terminal Railroad Company or its successors in title. In May, 1910, the State of New York appropriated a portion of the premises for the purpose of constructing its Barge canal across the same. In March, 1916, the relator and the State entered into a written agreement for the settlement of the damages caused by the appropriation. The State agreed to pay the relator the sum of $59,700.17, while the relator agreed to release the State from all claims for damages. The relator agreed to erect a bridge in accordance with certain designated plans and specifications in order to provide itself with an elevated railway crossing over the Barge canal prism to be constructed upon the premises appropriated. The State agreed to convey to relator by quitclaim deed " an easement to use and occupy forever said premises," by means of the elevated structures agreed upon, " for railroad purposes." The contract was carried out; the money was paid; the bridge was built, and the deed was given. The Barge canal was constructed across the premises, and after the construction work had sufficiently been advanced, the relator resumed its crossings, and has ever since operated its trains over the Barge canal by means of the elevated bridge erected in pursuance of the agreement. It is in part for the uses thus made of the bridge over the Barge canal that the relator has been assessed for special franchise tax purposes.

Chapter 147 of the Laws of 1903, known as the Barge Canal Act, as amended by chapter 196 of the Laws of 1908, provided in section 4 as follows: " The State Engineer may subject to the following conditions enter upon, take possession of and use lands, structures and waters, the appropriation of which for the use of the improved canals and for the purposes of the work and improvement authorized by this act, shall in his judgment be necessary." The act as thus amended further provided: " An accurate survey and map of all such lands shall be made by the State Engineer who shall annex thereto his certificate that the lands therein described are necessary for the use of the canals of the State." It further provided that the survey, map and certificate should be submitted to the advisory board of consulting engineers; that they should report thereon to the Canal Board; that the map, survey and certificate, after the same had been approved by the Canal Board, should be filed in the office of the State Engineer; that a duplicate copy thereof should be filed in the office of the Superintendent of Public Works. The act further provided for the service upon the owner of the appropriated properties of a notice stating the date of the filing of such map, survey and certificate and giving a specific description of the property taken. It further provided as follows: " From the time

of the service of such notice, the entry upon and the appropriation by the State of the real property therein described for the purposes of the work and improvement provided for by this act, shall be deemed complete, and such notice so served shall be conclusive evidence of such entry and appropriation and of the quantity and boundaries of the lands appropriated.''

A map and survey definitely describing by metes and bounds the property in the town of Gates occupied by the relator's predecessor which was sought to be appropriated, but not specifying the particular title therein desired, duly certified by the State Engineer, approved by the advisory board of consulting engineers and by the Canal Board, was, on the 5th day of May, 1910, filed in the office of the State Engineer, and a copy thereof was that day filed in the office of the Superintendent of Public Works. The map and survey filed bore the certificate of the State Engineer under date of May 3, 1910, as follows: '' I certify that the lands herein described are necessary for the canals of the State.'' It also bore the certificate of the secretary of the Canal Board as follows: '' I hereby certify that the Canal Board has duly approved of the foregoing map and that the lands designated therein were by the State Canal Board appropriated for the use of the canals of this State on this 5th day of May, 1910, pursuant to Chap. 147, Laws of 1903, as amended.'' On or prior to the 5th day of May, 1910, the required notice had been served upon the predecessor in title of the relator.

In *People ex rel. Rochester, Syracuse & Eastern R. Co.* v. *Moroney* (224 N. Y. 114) a map and survey, describing the relator's property to be appropriated, but not specifying the title desired, had been filed in the office of the State Engineer, and a copy thereof had been filed in the office of the Superintendent of Public Works. It bore the certificate of the State Engineer that the lands therein described '' 'had been permanently appropriated for the use of the improved Erie canal.' '' This was the certificate which was then required. (Laws of 1906, chap. 365, amdg. Barge Canal Act, § 4.) The required notice had also been served upon the relator. The court held that the filing of the map and survey together with the certificate of the State Engineer and the service of the notice caused the entire title in the premises appropriated to be transferred from the relator to the State. It said: '' If a perpetual easement and not the fee of the land is to be appropriated it should be so stated in the notice. (*People* v. *Fisher*, 190 N. Y. 468, 478.) The State Engineer is authorized to take such lands, structures and waters as shall in his judgment be necessary for the use of the improved canals. The lands of the relator were in this case taken as a permanent appropriation.

**764** PEOPLE EX REL. WESTERN N. Y. & PENN. R. CO. *v.* KNAPP.

Third Department, June, 1924. [Vol. 209

The lands so appropriated were designed for and actually used in the location and construction of the improved canal. The State became the owner of the fee of the land appropriated. * * * The relator's right of occupancy of the real property so taken was included in the permanent appropriation." In the case at bar the respondent argues that the appropriation was made subject to a reservation, in favor of the relator of an easement to cross the premises, by reason of the following provision in the Barge Canal Act: " New bridges shall be built over the canals to take the place of existing bridges wherever required, or rendered necessary by the new location of the canals." (Laws of 1903, chap. 147, § 3. See, also, Laws of 1908, chap. 508, and Laws of 1910, chap. 83, amdg. said § 3.) The same provision was in force when the appropriation was made in the *Moroney* case. It did not have the effect of persuading the Court of Appeals to hold that less than an absolute fee passed upon the appropriation. It can have no such effect upon this court in this case. We must hold then, under the authority of the *Moroney* case, that, by the filing of the map and survey and the service of the notice, the State acquired a title in fee to the premises in question.

Chapter 448 of the Laws of 1915 (amdg. Laws of 1908, chap. 195, § 2) created a bureau of appraisal in the office of the Superintendent of Public Works to consist of a special examiner and appraiser. These officers were required to visit and inspect lands appropriated for the uses of the canal. They were authorized to agree with the owners upon a fair valuation of the property taken, and further to agree upon a price to be paid therefor by the State and accepted by the owners in full compensation for the property and the damages resulting from the taking. The agreement was to become binding upon the State when approved by the Superintendent of Public Works and the Canal Board. The prescribed procedure was followed in the instance of the contract of settlement entered into between the State and the relator in relation to compensation to be paid for the appropriation now being considered. It will be observed that the State officers named in the statute were empowered to agree " upon a price to be paid " for lands appropriated, which was to be accepted by the owners in " full compensation." Nothing is said therein expressly empowering the officers named to agree upon a reconveyance to the owner of any interest in the lands appropriated. Nevertheless these officers did agree with the relator that the State would convey to the relator by quitclaim deed " an easement to use and occupy forever said premises * * * for railroad purposes," and a quitclaim deed was accordingly thereafter executed and delivered.

In *People ex rel. New York Central, etc., R. R. Co.* v. *Walsh* (211 N. Y. 90) the owner of appropriated lands and certain State officers, acting under a statute (Laws of 1910, chap. 334, amdg. Laws of 1908, chap. 195, § 2) conferring similar powers to those granted by chapter 448 of the Laws of 1915, entered into an agreement to fix the compensation to be paid. The State agreed to deliver to relator a quitclaim deed " conveying a permanent easement to use and occupy forever for railroad purposes the appropriated land." The court held that the State officers were empowered so to agree. Nevertheless the court proceeded to hold that section 35 of the Canal Law of 1909 and section 13 of the Railroad Law of 1890 (as amd. by Laws of 1897, chap. 235) applied. It said: " The relator has its power to construct its railroad across the canal, not from the fact of the appropriation of its right of way by the State, but from the provisions of the Railroad Law (Laws of 1890, ch. 565, sect. 4, subdivision 4)* giving it power to construct its road across any of the canals of the State." This would seem to mean that the relator, although it became the apparent grantee of an easement across the premises, enjoyed the right to cross, not as a landowner, but as the beneficiary of a privilege granted by the Legislature. The court further said: " The statutes contemplate that the manner and method of the crossing shall be supervised and acquiesced in, at least, by the Superintendent of Public Works. * * * He was not absolved, by the fact that the railroad preceded the canal, from the care, management and control of the canal committed to him by the statutes." In another part of the opinion the court said: " That they intended or agreed that the State should convey to the relator any interest or estate in the lands of the canal which would enable or permit the relator to own in fee, or control or occupy any part of the lands within the prism or essential to the use or purposes of the canal is unthinkable and contradictory of all the other provisions and the entire spirit and expressed purpose of the agreement." That part of section 35 of the Canal Law to which the court refers reads as follows: " The Superintendent of Public Works shall have a general supervisory power over so much of any railroad as passes over any canal or feeder belonging to the State, or approaches within ten rods thereof, so far as may be necessary to preserve the free and perfect use of such canals or feeders, or for making any repairs, improvements or alterations thereupon." (See, also, Railroad Law of 1910, § 24, revising Railroad Law of 1890, § 13.) The existence of such a power on the part of the Superintendent is

---

* Amd. by Laws of 1892, chap. 676; now Railroad Law of 1910, § 8, subd. 4.— [REP.

**766** PEOPLE EX REL. WESTERN N. Y. & PENN. R. CO. *v.* KNAPP.

Third Department, June, 1924.                    Vol. 209

scarcely compatible with an absolute ownership of a fee or a right of way on the part of a railroad. We learn from this opinion, then, the following: (1) The relator in the case exercised a right to cross the canal which was derived from a legislative railroad act. (2) The exercise of this right was at all times subject to a general supervisory power on the part of the Superintendent of Public Works. The conclusion seems inevitable that, in the *Walsh* case, as well as in this case, the right of the relator, although termed an " easement " in a quitclaim deed apparently granting it, was nothing more than a privilege or franchise " to construct, maintain or operate " a railroad over " highways or public places," within the definition of a " special franchise." (Tax Law, § 2, subd. 6, as renum. from subd. 3 and amd. by Laws of 1916, chap. 323.) This conclusion avoids all conflict with, or evasion of, that provision of the Constitution which forbids the Legislature from selling, leasing or otherwise disposing of the Erie canal and requires that it " shall remain the property of the State and under its management forever." (Const. art. 7, § 8.)

We decide, therefore, that this relator, in reference to the Gates-Rochester crossing, exercised a special franchise, and that an assessment was properly made therefor.

*The Chili-Rochester crossing.* The relator occupied with its tracks certain lands in the town of Chili in the county of Monroe over which it operated its trains. These lands had formerly constituted a part of the canal strip upon which the Genesee Valley canal, previously abandoned by the State, had been constructed. The Genesee Valley canal strip, with certain reservations as will afterwards appear, had been conveyed by the State to the relator's predecessor in title. Across a portion of the canal strip in the town of Chili occupied by the relator the State proposed to construct its Barge canal. The State claimed that the particular portion required had been reserved by it in its grant to the relator's predecessor. The relator, on the other hand, claimed that such land constituted a part of the grant. Under these circumstances the officials of the State determined to condemn the premises. Accordingly, we find that a map and survey of the land in question, entitled " Map of property rights, title and interest to be appropriated by the State of New York," describing the strip in question by metes and bounds, duly certified by the State Engineer and by the secretary of the Canal Board, on the 21st day of September, 1916, was filed in the office of the Superintendent of Public Works on the 9th day of October, 1916. Immediately following the clause describing the property to be appropriated appears the following statement: " This appropriation covers all the right, title

and interest of every kind and nature, legal or equitable, of the said Western New York and Pennsylvania Railway Company in and to the lands above described." There follows a further statement setting forth the fact that both the State and the railway company claim to own the land described; and that an agreement has been prepared and was ready for execution whereby the controversy as to the ownership of the premises was to be submitted to the Supreme Court. The required notice was duly served upon the relator at or about the time of the filing of the map. Subsequently, upon November 8, 1916, the relator and the officials of the State entered into an agreement in relation to the compensation of the relator. This agreement bears date November 8, 1916. The referee in his opinion has said: " After the terms of this contract had been agreed upon but before its formal execution and under date of September 21, 1916, the State officers made an appropriation of relator's property at this crossing, filing the requisite map for that purpose." We find no evidence in the record establishing this fact. On the contrary, the statements made upon the map itself show that the parties had in contemplation no such agreement. Moreover, even if the facts were as stated, the oral promises entered into by State officials and the relator could not have had the effect of lessening or qualifying the title which the map declared in specific terms was the subject of the appropriation. That title, as has appeared, was " all the right, title and interest of every kind and nature, legal or equitable " of the relator. The filing of the map with the survey attached thereto and the service of the notice upon the relator unquestionably operated to deprive the relator of all rights in the premises, if any, possessed by it. It is true that by the agreement made on the 8th day of November, 1916, it was, among other things, provided that the State of New York would deliver to the relator a quitclaim deed conveying to it " an easement to use and occupy forever the premises referred to," and that such a deed executed by the Superintendent of Public Works on behalf of the State was subsequently delivered. It is likewise true that on or about the 15th day of January, 1917, there was filed in the office of the Superintendent of Public Works an appropriation map of the premises in question in which it was stated that there was to be released and conveyed to the relator, " out of " the property appropriated, an " easement to use and occupy forever the premises referred to." Neither the contract thus made nor the map thus subsequently filed, could alter the fact that on or about the 9th day of October, 1916, the State had become, if it had not previously been, the absolute owner of the property in question. The case of the

**768** PEOPLE EX REL. WESTERN N. Y. & PENN. R. CO. *v.* KNAPP.

Third Department, June, 1924.                    [Vol. 209

relator, therefore, in regard to the Chili-Rochester crossing, is in precisely the same situation as the case made by it in reference to the Gates-Rochester crossing. For reasons which we have already stated in the matter of the Gates-Rochester crossing, we conclude that through the agreement entered into and the deed delivered the relator acquired in reference to the Chili-Rochester crossing not a title in fee or an easement over lands, but a special franchise or privilege for which it was liable to assessment.

*The Genesee Valley canal occupation.* The Genesee Valley canal extended from the Erie canal in the city of Rochester to a point near the Pennsylvania State line. It was constructed prior to the year 1840 upon lands owned by the State, and was operated as a canal by the State down to the 30th day of September, 1878. On the last-mentioned date the canal, pursuant to chapter 404 of the Laws of 1877, was abandoned and discontinued. The canal strip, between the Erie canal in the city of Rochester and the village of Milgrove in the county of Cattaraugus, was, with certain reservations, conveyed in about the year 1880 to the Genesee Valley Canal Railroad Company, the predecessor of the relator. Among other reservations appearing in the grant was the following: "Also the State reserves the right to retain that portion of said canal from the point where Allen's Creek feeder enters the same to the Erie canal." The Genesee Valley Canal Railroad Company which had begun its railroad construction, was, in August, 1881, in an action brought against it by the State upon an application made by the Superintendent of Public Works, restrained by an order of the Supreme Court from constructing the same upon the canal strip between Allen's Creek feeder and the Erie canal. On September 28, 1881, it made written application to the Superintendent of Public Works to construct its railroad on that portion of the canal strip in relation to which it had been enjoined. Thereafter, on the 30th day of September, 1881, the Superintendent of Public Works gave his permission in writing to the Genesee Valley Canal Railroad Company " to construct and build, maintain and operate its railroad upon and along that portion of the banks and prisms of said Genesee Valley canal " described in the application, upon certain terms and conditions. The writing contained this reservation: " Reserving, however, to the State of New York, such right of re-entry and re-occupancy on the part of the State of New York as the free and perfect use of the canals of the State of New York may at any future time require." It also contained this reservation: " And further reserving to the State of New York, the right to vacate and discontinue this permit upon a breach of any of the conditions to be performed by said rail-

road company as hereinbefore provided,  \*  \*  \*  and the State can re-enter the said premises upon said breach." The railroad company thereafter constructed its railroad upon the lands described in its application, and it and its successors have ever since continued to operate a railroad thereupon. For the use thus made of a portion of the canal strip therein described this assessment was made.

The State, by its deed to the Genesee Valley Canal Railroad Company, reserved " the right to retain " the premises in question. This reservation would seem to have been the equivalent of a reservation from the operation of the grant of one of the very parcels granted. Such a reservation would, of course, as to that parcel, have rendered the grant wholly nugatory. However, if we construe the grant of the premises covered by the reservation to have been, under special legislative sanction (Laws of 1880, chap. 326), a grant of a fee subject to a condition of defeasance at the option of the State, then certainly the State chose to revoke the grant when its Superintendent of Public Works caused the railroad company to be enjoined from exercising any rights of ownership over the premises. In either view, therefore, the State was the owner of the fee in the premises prior to the 28th day of September, 1881. It was after this date that the railroad company made its application to the Superintendent of Public Works for permission to use the premises, and received such permission. That permission constituted the only title or right under which the relator has occupied the premises. We think that the relator cannot now be heard to say that it is not now operating its railroad under the permission granted, or that it is not now exercising a special franchise in relation to the premises with which the permission deals.

The final order should be reversed on the law, with costs, and determination of the State Tax Commission in respect to the items of assessment under review confirmed, with fifty dollars costs and disbursements.

All concur, except COCHRANE, P. J., who dissents except as to the Genesee Valley canal occupation.

Final order reversed on the law, with costs, and determination of the State Tax Commission in respect to the items of assessment under review confirmed, with fifty dollars costs and disbursements.