Heffernan, J.
Tins proceeding was tried before a referee who was authorized to hear and determine the same. His decision sustained all the assessments sought to be reviewed with the exception of those covering the occupations at 167th Street and St. Mary’s Park Tunnel which were cancelled.
The railroad company appeals from that portion of the .final order which sustains the assessments claimed by it to be illegal and the City of New York and the State Tax Commission appeal '■ from that portion of the order which cancels the assessments on *731 the occupations at 167th Street and at St. Mary’s Park Tunnel. Both the city and the State Tax Commission have abandoned the appeal as to the occupation at 167th Street leaving the only ' question to be determined as to them the propriety of the order canceling the assessment as to St. Mary’s Park Tunnel.
The New York Central Railroad Company is a railroad corporation, organized pursuant to the laws of the State of New York and other States. It is the successor by mesne consolidations and mergers of the New York and Boston Railroad Company, the Yonkers Rapid Transit Railway Company and the New York and Putnam Railroad Company and owns and operates a railroad extending from Sedgwick Avenue near 158th Street in the borough of The Bronx, city of New York, to a connection with the New York and Harlem Railroad at Putnam Junction in Putnam County, State of New York, including a branch extending from Van Cortlandt Junction in the borough of The Bronx to Getty Square in the city of Yonkers.
It is, also, the successor by consolidation of the Spuyten Duyvil and Port Morris Railroad and owns and operates a railroad extending from a connection with the New York and Harlem Railroad at Mott Haven Junction in the borough of The Bronx to the city of Buffalo and other places within and without the State of New York.
The New York and Harlem Railroad Company owns and operates a railroad extending from East 42d Street in the borough of Manhattan through the borough of The Bronx to a connection with the Boston and Albany Railroad at Chatham in Columbia County, including a branch in the borough of The Bronx extending from Melrose Junction at Melrose Avenue to a terminus at Port Morris on'Long Island Sound.
The New York Central Railroad Company, is the lessee for a term of years of the lands, franchises and railroad of the New York and Harlem Railroad Company and is obligated to pay all taxes and assessments levied on the lands and railroad of such railroad company.
The relator’s line of railroad crosses and occupies various streets and public thoroughfares in the borough of The Bronx. Special franchise assessments were made by the State Tax Commission against the railroad company covering these various occupations for the year 1934. The relator does not question the assessments of all of such crossings and has waived its claim of overvaluation and inequality. The sole issue is whether the assessments at the following locations are illegal and not properly assessable as special franchise occupations': New York *732 Central — Main Line: — Macomb’s Dam Park track lengthwise; Bronx Terminal Market, track lengthwise; Exterior Street, under crossing; Bronx Terminal Market, track lengthwise; Cromwell Avenue, under crossing; Bronx Terminal Market, track lengthwise; New York Central — Putnam branch; Mosholu Avenue, over crossing; 167th Street, grade crossing; New York and Harlem Railroad — Port Morris branch; East 163d St., under crossing; Washington Avenue, under crossing; Third Avenue, under crossing; Westchester Avenue, under crossing; St. Ann’s Avenue, under crossing; East 149th Street, under crossing, Southern Boulevard, under crossing; St. Mary’s Park Tunnel.
The disputed assessments divide into four groups:
The first group contains those in the Bronx Terminal Market area, specifically, Macomb’s Dam Park, Bronx Terminal Market, Exterior Street and Cromwell Avenue. The assessments on various level crossings and undercrossings in the market development are challenged.
The second group of occupations includes those on the Putnam branch at Mosholu Avenue and at 167th Street.
The third group includes those on the Port Morris branch from 163d Street to Southern Boulevard.
The fourth occupancy, which is in a rather different class, is relator’s way through St. Mary’s Park.
The contentions of the relator with respect to the disputed assessments may be summarized as follows:
1. That the occupations in the Bronx Terminal Market area are not special franchises, and that the City of New York, with relation to such occupancies, was acting in its business, proprietary or individual capacity rather than in a legislative or governmental capacity, and that the Bronx Terminal Market locations are not public places as referred to and defined in subdivision 6 of section 2 of the Tax Law. .
2. That the assessment made against the New York Central Railroad — Putnam branch — for sidings and side track at 167th Street leading to the plant of the Hubbard-Floyd Company, Inc., is illegal because the franchise and the physical property are both owned by the Hubbard-Floyd Company, Inc.
3. That the assessments, made against the occupancies of New York and Harlem Railroad - — Port Morris branch — at East 163d Street, Washington Avenue, Third Avenue, Westchester Avenue, St. Ann’s Avenue and Southern Boulevard, and of the New York Central — Putnam branch at Mosholu Avenue, were *733 illegal because at each of these several places the predecessor railroad in title to that of the relator owned the fee to the land on which the railroad was constructed and had physical possession of the land occupied by these streets prior to the legal creation of streets at these crossing locations.
4. That the assessment made against the New York and Harlem Railroad — Port Morris branch — at East 149th Street, is also illegal because of prior occupancy of the land by relator at the original location, and that its right at the new location or present place of crossing, mandated by statute, is not a “ special franchise ”.
5. That the assessment made against the New York and Harlem Railroad — Port Morris branch —at St. Mary’s Park, is also illegal because the relator’s right of occupancy, at this location, is its ownership of an easement in the land it occupies and not any “ franchise ” grant.
The State Tax Commission and the City of New York contend that these assessments are all valid.
Subdivision 6 of section 2 of the Tax Law defines the terms “ land ”, “ real estate ”, and “ real property ” as including — “ all surface, underground or elevated railroads, including the value of all franchises, rights or permission to construct, maintain or operate the same in, under, above, on or through, streets, highways or public places; all railroad structures, substructures and superstructures, tracks and the iron thereon; * * * permitted or authorized to be made, laid or placed in, upon, above or under any public or private road, street or ground; * * *. A franchise, right, authority or permission * * * shall for the purpose of taxation be known as a ‘ special franchise.’ A special franchise shall be deemed to include the value of the tangible property * * * situated in, upon, under or above any street, highway, public place or public waters in connection with the special franchise. * * * ”
The question before the court, therefore, is whether or not the occupations of the various street crossings and other places listed above are taxable occupations of public places.
The special franchise of a corporation is its “ right to do something in the public street, or highway, which, except for the grant under which it is exercised, would be a trespass ” (People ex rel. N. Y. C. & H. R. R. R. Co. v. Gourley, 198 N. Y. 486, 492). “ It is a "mere privilege to do something in public streets and places not permitted to citizens generally ” (People ex rel. Met. St. Ry. Co. v. Tax Comrs., 174 N. Y. 417, 440). “ A special fran *734 chise must contain two elements, the element of the physical property in the streets, and the grant from the State of a right to construct, maintain or operate it. If either of these elements, the tangible or intangible, is missing, the other element cannot be a special franchise within the meaning of the law ” (People ex rel. Barron v. Knapp, 208 App. Div. 127, 130, affd. 239 N. Y. 581). Furthermore, “ A special franchise, as a right or privilege, is a fixed and not a transitory thing ” (People ex rel. N. Y. C. R. R. Co. v. Gilchrist, 129 Misc. 811).
There are six separate crossings involved in the assessment in the first group. As to two of these, Exterior Street and Cromwell Avenue, the relator failed to file a protest with the State Tax Commission and these parts of the assessment were sustained by the referee for that reason. The specific ground of the relator’s protest as to this assessment is that Bronx Terminal Market is not a public place under the definition of public places as found in the Tax Law. A further objection is made that the City of New York in operating the Bronx Terminal Market was acting in its business, proprietary or individual capacity rather than in a legislative or governmental capacity. The relator crosses and occupies the six locations referred to above under agreements made with the City of New York dated June 21, 1928, and April 26, 1935. The relator failed to make any proof as to the status of the street, parks and market places at the time of making the original Bronx Market agreement or as of October 1, 1934, but rested its case solely upon the basis that the Bronx Terminal Market is not a public, place. The relator occupies these particular locations by virtue of grants or permits from the City of New York under the city’s franchise power. These franchises and the tangible property used in connection therewith are properly subject to assessment as special franchise property by the State Tax Commission and hence the referee properly sustained such assessments.
Macomb’s Dam Park and the Brónx Terminal Market locations are public places within the meaning of the Tax Law. The franchises owned by relator on these crossing locations are the usual franchises or permits which are subject to valuation under the Tax Law and the tangible property situated at these particular locations and included in the assessments is concededly owned by relator; such assessments are, therefore .legal and proper.
With respect to the occupation at Mosholu Avenue the referee found that the assessment should be confirmed. He also found *735 that the only issue raised by relator as to this occupation is one of overvaluation and that having failed to file a protest on that ground it is now estopped to question the assessment. Apparently Mosholu Avenue is relocated pursuant to an order of the Public Service Commission made on May 19, 1925. There is no proof to show whether relator’s tracks were installed before the opening of the street or after it. The railroad company originally occupied but a part of Mosholu Avenue and it now occupies the exact center of that highway as relocated.
With regard to the occupations in the third group on the Port Morris branch of relator’s railroad extending from 163d Street to Southern Boulevard the relator contends that, such assessments are illegal on the ground that it was a prior occupant at the several locations assessed. The crossing at Washington Avenue was withdrawn from the proceeding. The referee sustained the other assessments. We think his conclusions must be sustained as to all these crossings except that of Third Avenue.
The Port Morris branch was acquired by New York and Harlem Bailroad Company from Gouverneur Morris by deed which although dated April • 30, 1853, was apparently not delivered until August 9, 1853, when the board of directors of New York and Harlem Bailroad Company decided to accept Gouverneur Morris’ offer of the sale of the branch railroad. There seems to be no dispute about the fact that the Port Morris branch was built by Gouverneur Morris as his own purely private venture sometime between 1849 and 1853. It crossed two public highways. They were the Boston Post Boad and the Southern Westchester Turnpike, a public toll road created by chapter 63 of the Laws of 1811. Even though it might have been later abandoned, the Southern Westchester Turnpike still retained its characteristics as a public road (Walker v. Caywood, 31 N. Y. 51 [1865]; Tifft v. City of Buffalo, 82 N. Y. 204 [1880]). With respect to these two highways there was no legitimate crossing until the New York & Harlem Bailroad Company acquired the branch line of Gouverneur Morris on August 9, 1853, at which time it obtained authority to occupy and cross the streets and roads herein involved under the-provisions of the General Bailroad Law (L. 1850, ch. 140, see §§ 28, 49). The earliest date, therefore, at which relator can assert any prior occupancy is August 9, 1853. In the deed to relator, Morris made the following reservation: “ The said Gouverneur Morris also reserves to himself his heirs and assigns for ever the right to cross the said Morrisania Branch *736 Bailroad at all points where streets are now laidout crossing the same according to the Maps of North Melrose and East Morrisania now on file in the county clerk’s office at White Plains, and a Map of Port Morris dated April 30th, 1853 to be filed in said office and as shown on the said Bailroad Map,, and all the rights of the public to cross said Bailroad over the present highways intersecting said Bailroad are also reserved and excepted.”
The streets referred to in the reservation just quoted are those set forth on the right of way map which accompanied the Morris deed. All the streets under consideration at the present time are shown upon the right of way map: First Street (now 163d Street), Union Street and Washington Avenue (now 162d Street and Elton Avenue), Old Boston Boad (now Third Avenue), Westchester Avenue (still so-called), St. Ann’s Avenue (still so-called), Westchester Bailroad Avenue (now East 149th Street) and Beach Avenue (now Southern Boulevard). Belator thus purchased its railroad subject, first, to the rights of G-ouverneur Morris, his successors and assigns in the streets laid out bn the map, and, seeend, tb the rights of the public in any highways which cross the railroad.
The referee found that there was no legally occnpied railroad in existence prior to April 30, 1853. The referee also found that all the streets and avenues in this group were shown upon the early maps as well as upon the right of way attached to the deed from Morris to the railroad company. In fact Morris conveyed lots to various owners making direct reference to the maps and the streets and avenues set forth. The relator failed to establish that the streets and highways were not public streets when the branch railroad was purchased and that the reservation in the Morris deed did not subject its right to the mapped streets to those of the public. The proof is also clear that the deeds from Morris to various grantees constituted an offer by him to dedicate the streets laid out upon the maps. The relator has also failed to show that there was any lapse in the public use of the present streets. The area within which these particular crossing locations are situated was formerly part of the Town of Westchester, Westchester County. By chapter 279 of the Laws of 1846, the Town of Westchester was divided into the new town of West Farms, created out of the southwesterly portion of the former town. By chapter 210 of the Laws of 1856, the Town of West Farms was in turn subdivided by the creation of a new town called Morrisania, which embraced the *737 southerly portion of the Town of West Farms. Finally, both towns of Morrisania and West Farms were taken from the County of Westchester and annexed to the City of New York under chapter 613 of the Laws of 1873. In 1868, the Legislature passed chapter 841 which called for the “ laying out, opening and closing of streets, roads and avenues, in the town of Morrisania, in the county of Westchester.” Section 2 of this 1868 Act reads in part as follows: “ * * * adopt and retain, or reject, such highways, streets, roads or avenues, or portions thereof, as are now actually laid out and opened and in use as public streets, roads or highways, or such streets, roads or avenues as have been or shall be dedicated to public use, not in actual use, in said town, as they shall think proper.”
The map made pursuant to the Act of 1868 wTas completed in 1870 and the survey which is part of the map shows all the streets in question. We fully agree with the referee’s conclusions as to the crossings in this group to which we have referred.
We disagree with the referee’s finding as to the crossing at Third Avenue (originally Boston Post Road and later Morse Avenue). The referee correctly found that relator is the prior occupant of Third Avenue. Under such circumstances relator’s occupation does not constitute a special franchise (People ex rel. N. Y. C. & H. R. R. R. Co. v. Woodbury [1911], 203 N. Y. 167; People ex rel. N. Y. C. & H. R. R. R. Co. v. Woodbury [1915], 167 App. Div. 428).
Relator failed to protest the assessment and further mistakenly reported Third Avenue as subject to special franchise assessment. While the referee found relator to be the prior occupant at Third Avenue, he confirmed the assessment due to the fact that relator had failed to protest the assessment and had reported the same as a special franchise, although it had claimed “ prior * * * occupancy ” in the petition for writ of certiorari. Since the determination in the within proceeding the Court of Appeals has settled the law on these issues by its decision in People ex rel. N. Y. C. R. R. Co v. State Tax Comm. (292 N. Y. 130). In this case the court approved the holding in People ex rel. Erie R. R. Co. v. Tax Comm. (246 N. Y. 322) that relator’s assertion that assessments “ were totally void for lack of jurisdiction could be made at any time
With reference to St. Mary’s Park Tunnel the referee reported that this assessment is invalid and should be cancelled. A part of the area comprising St. Mary’s Park Tunnel was acquired by the City of New York by virtue of the Laws of 1884 (oh. 522), *738 the easterly boundary of the park extending to and paralleling the right of way of the Port Morris branch of the railroad. No portion of the railroad, however, was within the park area. The railroad was operated on a right of way which it owned in'fee and hence.was not enjoying any special franchise at this location. To rid the park of the railroad and to enable the city to construct its streets at a grade indicated on maps and profiles of the 23d and 24th Wards and also to effect a separation of the street and railroad grades between the northerly side of Westchester Avenue and the terminus of the Port Morris branch at the East River, chapter 424 of the Laws of 1903 was enacted. The plan contemplated by this enactment provided for a depression of the Port Morris branch so that it was to pass through and under the surface of St. Mary’s Park in a tunnel. The act also provided conveyance in fee by' the railroad company to the city of the abandoned right of way skirting the park. The work of depressing relocating the railroad was done at the latter’s expense. In accordance with this act the city by an instrument dated December 24, 1903, conveyed to the New York and Harlem Ráilroad Company, “ its successors and assigns, the right to use and occupy for the purposes of its incorporation and during the term of its corporate existence, so much space as a right of way as is shown on said plans and profiles so approved, under the present and proposed surface of St. Mary’s Park * *
Upon completion of the relocation and depression of the railroad and in compliance Avith the pertinent provisions of chapter 424 of the Laws of 1903, and further in compliance with condition contained in the indenture dated December 24,1903, the railroad company, by instrument dated January 8, 1908, conveyed its abandoned right of way to the City of New York, which was thereupon added to the park area. By this exchange of conveyances the railroad company ceded a right of way in fee and acquired a, substitute right of way. by easement. It received such an interest in land as authorized it to construct its tunnel and railroad in such surface area, not under any franchise emanating from the sovereign but by virtue of its ownership of an interest in land, “ To have and to hold the said premises unto the said party of the second part, its successors and assigns, forever.” The City of New York in making the grant exercised its proprietary rights and there was no exercise of the sovereign power to grant a franchise. • Undoubtedly relator built its tunnel, laid its tracks and operates its trains not as a licensee *739 or as the beneficiary of a public franchise, but as the owner of an interest in land. The law is well settled that if a railroad company occupies a public place under its general charter powers or by authority of a statute, such occupation is permissive and by favor of the sovereign and is properly subject to special franchise assessment. However, if its occupation of a public place be derived from a conveyance from a political subdivision its occupation is by virtue of an interest in land and not by reason of public favor, and in such instance no special franchise exists. The relator has an estate or interest in the land as granted to it by the city which was superior to a “ franchise ”. The new location is not a “ special franchise ” (People ex rel. Long Island R. R. Co. v. Tax Comrs., 148 App. Div. 751, affd. 207 N. Y. 683; People ex rel. Hudson & Manhattan R. R. Co. v. Tax Comrs., 203 N. Y. 119; People ex rel. N. Y. C. R. R. Co. v. Woodbury, 203 N. Y. 167, supra; People ex rel. Western New York and Pennsylvania Ry. Co. v. Knapp, 241 N. Y. 364; People ex rel. R., S. & E. R. R. Co. v. Moroney, 224 N. Y. 114).
Again, as to the statute under authority of which relator’s railroad was relocated in St. Mary’s Park, it is significant that the language of the enactment specifically provides in part that: “ § 5. Nothing in this act contained shall have the effect of limiting or impairing in any manner or to any extent the existing rights, privileges or franchises of the said railroad corporations, or either of them, or of depriving in any manner or to any extent such railroad corporations,' or either of them, of the use and benefit of such rights, privileges and franchises, except in so far only as such rights, privileges or franchises shall be expressly limited or modified by this act * * (L. 1903, ch. 424, § 5.)
Concededly, relator was not subject to a special franchise tax at its original location since its title was in fee and it occupied no public place within the meaning of the pertinent provision of the Tax Law. It seems conclusive that the intent of the Legislature was to transfer to the relocated portion of relator’s; road all the existing fights and privileges which it possessed at the original location, including the right and privilege of exemption from a special franchise tax.
The decision of the referee, as thus modified, should be. affirmed, without costs to either party.
*740 The court reverses and annuls conclusions of law numbered 34 and 35 as to Third Avenue insofar as they sustain the legality of that assessment.
The court adopts the following conclusion of law with respect to Third Avenue: Belator is not estopped from contesting the legality of that assessment. Belator is a prior occupant at Third Avenue and not subject to a special franchise assessment. It is entitled to a refund of the taxes paid thereon.