[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 92 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 93 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 94 
The alleged invalidity of the agreement of July 27, 1911, results, the learned attorney-general asserts, from several of its provisions. He points out as invalid and unenforceable the provision requiring the state to convey to the relator by a quitclaim deed a permanent easement to use for railroad purposes the land of relator's right of *Page 96 
way which was appropriated by the state. It is, of course, conceded and expressed by the parties that the use and occupation of the land under the easement was that to be effected by the erection and maintenance of the bridge in accordance with the plans adopted by them. The making of the agreement and the approval or reapproval of the plans were dependent parts of one transaction, and by virtue of the statutes, which are operative in connection with the agreement, the superintendent of public works possesses a general supervisory power over the use and occupation by the relator in so far as may be necessary to preserve the free and perfect use of the canal or to make any repairs, alterations or improvements in the same. (Canal Law [Cons. Laws, ch. V], sec. 35; Railroad Law [Laws 1890, ch. 565], sec. 13.)
The argument of the attorney-general at this point is: The state is compelled by the Constitution (Art. 7, sec. 8) to acquire, vest and retain in the people of the state the fee simple to the appropriated land, and section 4 of chapter 147 of the Laws of 1903 is in accord with the constitutional purpose. This conclusion is erroneous. The constitutional provision referred to forbids the legislature from selling, leasing or otherwise disposing of the Erie canal, the Oswego canal, the Champlain canal, the Cayuga and Seneca canal or the Black River canal; "but they shall remain the property of the state and under its management forever." Its purpose and its effect is that those canals as highways of commerce, connecting the great lakes with the Atlantic ocean, should forever remain the property of the state, and under its management and in no wise or particular be transferred to corporations or individuals. (Sweet v. City ofSyracuse, 129 N.Y. 316, 333, 339.) It does not relate to the quality of the title acquired or held by the state to the canal lands, but secures to the state the control, regulation and management of the canals so long as they are channels of transportation. It does not interdict the legislature from *Page 97 
authorizing the appropriation of an estate less than the fee in the lands required for the canals. Were the contrary true, the frequent legislative grants of power to transportation companies to construct their lines across the canals would be constitutionally invalid, because while a grant of such power is a franchise the exercise of it by constructing the crossing and the resulting actual use and occupation is the acquisition of an easement or interest in the canal lands. The constitutional provision did not prohibit the state from agreeing to convey to the relator the permanent easement in the appropriated lands.
Chapter 147 of the Laws of 1903 does not require the acquisition, and as a reasonable conclusion through implication the retention of a title in fee to the lands appropriated under it. Section 4 thereof authorizes the state engineer to "enter upon, take possession of and use lands, structures and waters, the appropriation of which for the use of the improved canals and for the purposes of the work and improvement authorized by this act, shall in his judgment be necessary," and directs him to make "an accurate survey and map of all such lands" and annex thereto his certificate "that the lands therein described have been appropriated." It directs the superintendent of public works, in whose office a certified duplicate copy of the map and certificate of the state engineer must be filed, to serve upon the "owner of any real property so appropriated" a prescribed notice specifically describing "that portion of such real property belonging to such owner which has been so appropriated," and provides that "from the time of the service of such notice, the entry upon and the appropriation by the state of the real property therein described for the purposes of the work and improvement provided for by this act, shall be deemed complete." This act contains no other provision expressive of an intent of the legislature as to the interest or estate to be taken. The Canal Law (Laws of 1894, ch. 338) omitted the requirement of the revised and the *Page 98 
anterior statutes (Rev. Stat. part 1, ch. 9, title 9, art. 3, sects. 46, 48, 52; Laws of 1817, ch. 262, sec. 3) that the state should take the title in fee simple of the lands appropriated, and enacted, "The title to all real property permanently appropriated for the use of the canals of the state shall be vested in the people of the state." (Cons. Laws, ch. 5, § 83.) The term "real property" includes "real estate, lands, tenements and hereditaments, corporeal and incorporeal" (General Construction Law, sect. 40), or as defined in the Condemnation Law, "any right, interest or easement therein or appurtenances thereto" (Code of Civ. Pro. sect. 3358), and as used in section 4 of chapter 147 of the Laws of 1903 or sections 80 and 83 of the Canal Law is satisfied by the appropriation of an easement adequate for the use necessitating the taking. What we have just written is true likewise of the term "land" or "lands." (People
v. Fisher, 190 N.Y. 468; Newton v. City of Newton,188 Mass. 226; Fish v. Fowlie, 58 Cal. 373; Brooklyn Park Com. v. Armstrong, 45 N.Y. 234; Whitman v. Town of Pownal,19 Vt. 223.) In the present case the state engineer and surveyor was authorized to determine not only the lands, structures and waters, but also the estate or interest therein required for the use of the improved canals.
The agreement on behalf of the state to convey to the relator the two lateral strips of land, each extending through and including a part of the canal prism, raises a serious question. If this is an agreement to convey the fee to the land within the blue lines of the canal with the consequent right of occupation it would undertake to create the opportunity or possibility of destroying the canal as a route of commerce, and would, therefore, violate the provision of the Constitution above referred to. The contract as an entirety plainly shows that such was not the agreement. The appropriation map with the certificate of the state engineer that the lands therein described are required for the use of the canals of the *Page 99 
state, and the plans of the bridge which the relator agreed to erect and maintain to carry its tracks and traffic over the canal are annexed to and by express language made a part of the contract. The contract recites "that the public use of said lands (appropriated) for both railroad and canal purposes may be conserved and adequately protected by the erection of a bridge carrying said railroad tracks over said canal." It recites: "It is deemed advisable to adjust and settle any and all damages which have been or may be caused" to the relator by the appropriation of its lands "for the construction and maintenance of said canal." The relator agrees to construct the bridge "to carry their tracks and traffic over the said canal." The plans for the bridge portray the canal lands as wholly unobstructed, and the lateral strips used upon either side of the canal lands, and there only, as parts of the embankment or right of way of relator necessarily widened at its base because of its increased elevation. The contract in itself, its recitals and its plans, clearly and with certainty discloses that the contracting parties had in mind and intention that the canal was to be constructed, maintained and operated and was to be controlled, possessed and occupied by the state, and that the railroad of the relator should be constructed across and over it and upon the lands as delineated by the plans. That they intended or agreed that the state should convey to the relator any interest or estate in the lands of the canal which would enable or permit the relator to own in fee, or control or occupy any part of the lands within the prism or essential to the use or purposes of the canal is unthinkable and contradictory of all the other provisions and the entire spirit and expressed purpose of the agreement. Viewing the specific agreement to convey to the relator the strips of land from the standpoint of the literal sense of its language, it works a result unreasonable and destructive of the very purpose contemplated in the contract and from which it sprung, *Page 100 
and an obscurity of meaning evoking an attempt to ascertain, through interpretation, a meaning and understanding of the parties reasonable and executable. (Knower v. Emerson, 9 Pick. 422.) We must look to the contract as a whole, to the subject with which it deals, to the circumstances under which it was made and thereby determine the true intent and purpose of the parties, and if such intent and purpose is reasonably within the scope of the language used it must be taken to be a part of the contract the same as if it were plainly expressed. Indeterminate forms of expression inconsistent with the evident design of a contract are to be understood in a sense subservient to the general purposes of the contract. The generality of the words used should be restrained by the particular occasion. "All words," says Lord Bacon, "whether they be in deeds, or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and the person." (Bacon's Law Maxims, reg. 10.) Words should not be taken in their broadest import when they are equally appropriate in a sense limited to the object the parties had in view. The ascertainment of the substantial intent of the parties is the fundamental rule in the construction of all agreements. (CanalCo. v. Hill, 15 Wall. 94.) An agreement will not be adjudged to be illegal where it is capable of a construction which will make it valid. (Lorillard v. Clyde, 86 N.Y. 384, 387; Hobbs
v. McLean, 117 U.S. 567.)
We are to assume that the parties made the contract in good faith and for the praiseworthy object expressed, of avoiding litigation, and we must construe their language, if practicable, with a view to this object, and in the light of such existing facts as the parties are presumed to have known. (Woodruff v.Woodruff, 52 N.Y. 53.) The contracting parties clearly had in view a definite result, namely, the fixing of the sum the state should pay the relator as its damages, and, as necessary elements in *Page 101 
reaching those damages, that the right of way of the relator should be re-established and under a completed and definite method and plan. Obviously the damages of the relator could not be estimated unless and until those facts existed. By the mutually accepted plans the state had, prior to July 27, 1911, through its officers duly empowered, subjected the appropriated lands and the strips of land to easements vested in the relator. The relator had accepted those easements as adequate for the use of its railroad. The term "land" or "strip of land" has, as we have stated, an indeterminate or general, and not a rigid or single meaning, and under the rules of construction and the circumstances above stated it seems clear that the parties intended and agreed to confirm, as the basis for fixing the damages, the state of things as existing at the time the contract was made, and that the state should convey to the relator the easement only in those strips of land as the plans required. The state did not agree to convey them in fee simple, and, therefore, the Constitution does not nullify the agreement.
We hold, therefore, that the People of the state were not forbidden by the Constitution to make the contract. Whether or not they had by legislative enactment empowered the special examiner and appraiser, the superintendent of public works and the canal board to make it in their behalf remains to be considered. The special examiner and appraiser had the power to fix and determine with an owner of appropriated real property upon a fair valuation of it, or the damage resulting to the owner, and to agree upon a price to be paid therefor by the state and accepted by the owner in full compensation for such real property, "or for the damage caused by said work or improvement." The agreement of the special examiner "shall be reduced to writing and signed" by the parties, and submitted by him "to the superintendent of public works who, if he shall approve, shall submit said agreement to the canal board with his recommendations, for approval." *Page 102 
"If in the opinion of the canal board, it is possible by means of such appraisal and agreement, to acquire for the state a good title to the entire interest of any specific parcel of land or other property or right necessary for said improvement within the survey made by the state engineer and surveyor and certified by him, pursuant to section four of chapter one hundred and forty-seven of the laws of nineteen hundred and three, and acts amendatory thereof, and that it will be for the advantage of the state to obtain such specific property or right without condemnation proceedings or resort by said owners to the court of claims, said canal board shall approve such agreement so entered into with such owners, and upon the presentation and delivery of proper conveyances, duly approved by the attorney-general, said canal board may certify its acceptance thereof to the comptroller for payment under the provisions of section thirteen of chapter one hundred and forty-seven of the laws of nineteen hundred and three, and acts amendatory thereof, to the owner or owners severally named therein." (Laws of 1908, ch. 195, as amended by Laws of 1910, ch. 334.) Apart from the restrictions imposed by the Constitution, the legislature is as free as is the individual to give authority to compromise or adjust unliquidated liabilities or adverse demands and avoid thereby litigation. The legislative act providing for the appointment of the special examiner and appraiser and defining his powers is such an authority and should be given such scope and liberality fitted to its purpose as a fair and reasonable construction may yield. All the stipulations of the agreement of July 27, 1911, are related to the basis for estimating the damages or to their sum. The agreement was inchoate until approved by the superintendent of public works and the canal board to whom are committed by the legislature comprehensive powers of control and management of the canals. The provisions of the agreement are consistent with and within those powers and we perceive therein no use or *Page 103 
exercise of the legislative act hazardous or harmful to the state. It would not be advantageous to the state or a wise or intelligent construction of the act to hold that the damages of the relator may not, by agreement, be reduced or prevented or settled in part by lawful acts of the state beneficial to the relator.
The defendants urge that certain of the sums to be paid as damages and entering into the aggregate sum of $352,993.50 should not have been included. The purposes for which the sums objected to were allowed were lawful bases for damages. The relator was entitled to be paid the damages resulting or accruing to it in consequence of the appropriation of its land, after deducting therefrom the benefits received by or resulting to it in consequence of the construction and maintenance of the canal. (Canal Law, sec. 83.) It is not claimed that the sum of the damages as fixed by the agreement is affected by fraud, collusion or bad faith. We are not at liberty to review, even were we so inclined, the fairness or unfairness of the sum. Such review would involve intricate questions of fact, but no question of law.
We have not overlooked any of the arguments or assertions in the brief of the learned attorney-general. While we do not find in the agreement any provision or stipulation invalidating it, we think the Special Term order and the writ issued should be modified by striking from them the parts commanding the defendant Milliman, special examiner and appraiser, to execute or procure the execution of and cause to be delivered to the relator the quitclaim deeds as described in them. The provision of section 35
of the Canal Law and section 13 of the Railroad Law that the superintendent of public works shall have a general supervisory power over so much of any railroad as passes over any canal or feeder belonging to the state, so far as may be necessary to preserve the free and perfect use of such canal or feeders, or for making any repairs, improvements or alterations thereupon *Page 104 
applies to the present crossing of the canal by the railroad of relator. The relator has its power to construct its railroad across the canal, not from the fact of the appropriation of its right of way by the state, but from the provision of the Railroad Law (Laws of 1890, ch. 565, sect. 4, subdivision 4) giving it power to construct its road across any of the canals of the state. The statutes contemplate that the manner and method of the crossing shall be supervised and acquiesced in, at least, by the superintendent of public works. While the relator had the right to construct its railroad across the canal, the superintendent of public works had the right and was under the duty to participate in the manner and method of crossing. He was not absolved, by the fact that the railroad preceded the canal, from the care, management and control of the canal committed to him by the statutes. The statutes devolved upon him the power and duty, subject to the prescribed restrictions, to give the consents, licenses or easements, oral or written, suitable to the crossing determined upon. Under the statutes and the agreement approved by him and the canal board, he was under the legal duty to execute and deliver to the relator for and on behalf of the state the quitclaim deeds promised by the contract.
The order of the Appellate Division should be reversed and the order of the Special Term and the writ issued pursuant thereto modified as above indicated, and as so modified affirmed, without costs to either party.