EIGHTH AVENUE COACH CORPORATION, Plaintiff, *v.* THE CITY OF NEW YORK and Others, Defendants.

JOSEPH T. McCARTHY, Plaintiff, *v.* THE CITY OF NEW YORK, and Others, Defendants.

Supreme Court, Special Term, New York County, February 28, 1939.

*Wright, Gordon, Zachry & Parlin* [*Boykin C. Wright, James A. Fowler, Jr., John T. Cahill* and *Mathias F. Correa* of counsel], for the plaintiff Eighth Avenue Coach Corporation.

*Kadel, Sheils & Weiss* [*William J. Sheils* of counsel], for the plaintiff Joseph T. McCarthy.

*William C. Chanler, Corporation Counsel* [*Herman Horowitz, Assistant Corporation Counsel,* of counsel], for the defendants.

COTILLO, J. These two actions, for the same relief and based on the same fundamental facts, were consolidated for trial. Both plaintiffs seek to restrain the defendants from making or enforcing a regulation proposed by the defendant police commissioner which if effective would permit only south-bound traffic on Eighth avenue from Fifty-seventh street to Bethune street, and only north-bound traffic on Ninth avenue from Fourteenth to Fifty-ninth street and on Columbus avenue from Fifty-ninth street to Sixty-fourth street.

The plaintiff coach corporation predicates its right to permanent injunctive relief upon the terms of the franchise set forth in its contract with the city dated October 18, 1935, pursuant to which it has since been and now is operating omnibuses for the traveling public northerly and southerly on Eighth and Ninth avenues. The proposed regulation would materially interfere with the operation of this plaintiff's public transit facilities, and, it asserts, would greatly decrease its revenues and the value of its franchise.

The plaintiff McCarthy sues as a taxpayer, alleging that enforcement of the police regulation would result in waste of the city's money, inconvenience to the traveling public and damage and loss to property owners, merchants and other business people in the affected areas. The claim of waste is predicated on the danger of recovery from the city of substantial damages by the coach corporation if the proposed one-way traffic order is enforced, as well as upon loss of revenues to the city.

Motions made in each action for temporary injunctions restraining defendants from enforcing the regulations during the pendency of this suit were denied at Special Term, the justice there presiding stating in a brief opinion that the franchise was subject to regulations made by the police department; that the regulations complained of were " neither arbitrary nor so clearly unreasonable as to justify the granting at this time of the relief sought by plaintiff." The opinion directed that a trial be had on the first Monday of June, " thus affording an interim period of observation and experiment which should be productive of additional facts bearing on the practicability and efficacy of the new regulations for presentation to the trial court."

Both plaintiffs, however, appealed to the Appellate Division from the order denying their motions (254 App. Div. 829, 830). That court reversed the order made at Special Term in the coach corporation action, stating in a *per curiam* opinion: " We believe the ends of justice will be best served if the decision of the novel and important questions of law involved in this action be deferred until the essential facts are found after a trial. There is nothing in the record to show that any emergency exists requiring the immediate regulation of traffic on the avenues involved by making them one-way streets forthwith. An injunction *pendente lite* will be granted, and the trial of the action set down for June 13, 1938."

The order made in the taxpayer's action was affirmed because, as stated by the Appellate Division, an injunction having been granted by that court in the coach corporation action, no necessity existed for duplicating the relief.

By reason of the temporary injunction granted by the Appellate Division, the enforcement of the police regulation has been stayed, and there has been no opportunity for the interim period of observation and experiment from which facts could be presented to the court bearing on the practicability and efficacy of the new regulation. Upon the trial opinion evidence predicated upon such data as could be secured from all available sources has been adduced in lieu of proof of actual results of one-way traffic. This is not said in criticism of the temporary injunction, but in explanation of the wide latitude granted upon the trial in an effort to obtain all possible light upon the controverted issues.

It will be helpful in determining such issues to state as definitely as need be the routes over which the coach corporation is authorized to operate, and the nature and terms of the police regulation sought to be enjoined in so far as it affects such routes. For brevity, the coach corporation will hereinafter be referred to as the plaintiff.

Plaintiff's franchise to operate buses on Eighth and Ninth avenues was granted by the terms of a contract entered into by it with the city on October 16, 1935, as thereafter formally modified by contract dated August 11, 1937, which merely extended its route two-tenths of a mile southerly from Vesey street to Cortlandt street. It consists of two routes, the Eighth avenue route, designated as M-41 and the Ninth avenue route, designated as M-42. Each route is wholly separate and independent of the other and one does not intersect the other at any point. They are both distinctly uptown and downtown lines, there being no crosstown operation at any point save only that at certain points buses are required to travel east or west for one or two blocks, but never between the two separate routes. Two-way operation on each route was con-

templated and specifically provided for in the contract. Route M-41 runs from Cortlandt street on parts of West, Washington and Greenwich streets, West Broadway and Hudson street, to and along Eighth avenue and thence northerly along other avenues to the Polo Grounds as the northerly limit. Route M-42 runs along Ninth, Amsterdam and Columbus avenues from Gansevoort street to approximately One Hundred and Twenty-sixth street. The M-41 route requires the operation of buses over Eighth avenue from Abingdon square to Fifty-ninth street or Columbus circle, a distance of about two and one-half miles. Route M-42 calls for operation of buses over Ninth avenue between Gansevoort street and Fifty-ninth street and over Columbus avenue from Fifty-ninth to Sixty-third streets, being the southerly two and one-half miles of this six-mile route.

On March 16, 1938, the defendant police commissioner sent plaintiffs a letter stating: " Official notice is hereby given that beginning at 8:00 A. M. April 4th, 1938, the following thoroughfares will be designated for one-way traffic only, as indicated: *One-Way Northbound* — Hudson Street — from Abingdon Square to 14th Street. Ninth Avenue — from 14th Street to 59th Street. Columbus Avenue — from 59th Street to 64th Street. *One Way Southbound* — Eighth Avenue — from 57th Street to Hudson Street." The letter stated that from the time these regulations became effective no vehicles would be permitted to proceed contrary to the traffic directions of the thoroughfares named and notified plaintiff that " pursuant to the terms of the Contract which you obtained from the Board of Estimate it will be necessary for your corporation to apply to that Board for approval of the following routes to be taken by your buses on and after April 4th, 1938." Then followed detailed instructions rerouting plaintiff's bus line by discontinuing two-way traffic and substituting north-bound traffic only on Hudson street, Ninth avenue and Columbus avenue from Bank street to Sixty-fourth street and south-bound traffic only on Eighth avenue from Columbus circle to Abingdon square, with cross-overs on streets connecting Eighth and Ninth avenues at both ends of the affected area.

However, as pointed out in the opinion at Special Term on the motion for a temporary injunction, under the provisions of the city charter empowering the police department to regulate vehicular traffic, no regulation made by the commissioner shall become effective until filed with the city clerk and published in the *City Record*. The letter of March 16, 1938, thus had no force as a police regulation. On March 26, 1938, the police commissioner caused to be published in the *City Record* a notice signed by him dated March

24, 1938, in which he designated "the following thoroughfares as one-way streets for vehicular traffic, for a temporary period of 30 days from 8:00 A. M., April 4, 1938, effective upon the installation of the necessary signs: Borough of Manhattan, 8th Ave., 57th to Bethune Street, southbound. 9th Ave., 14th to 59th St. northbound. Columbus Ave., 59th St. to 64th St., northbound." The streets and avenues thus listed for one-way traffic differ materially from those specified in the letter of the commissioner to plaintiff dated March 16, 1938. Being the only regulation promulgated in the manner required by the charter, this notice must be regarded as the only official attempt to regulate traffic on the streets and avenues in question.

It is to enjoin the enforcement of this proposed resolution that these actions were instituted and the general broad question involved in the coach corporation's suit is whether its franchise can be thus informally and arbitrarily modified by the police commissioner under the guise of a resolution regulating vehicular traffic. The charter vests the power to formulate and enforce traffic regulations in the police department. With the wisdom of the proposed regulations this court is not concerned. It is not to substitute its judgment in such matters for that of the duly constituted authorities in whom the power is lodged. The court will merely pass upon the legal rights of the interested parties to these actions, and will first consider those involved in the coach corporation's action. The questions there presented involve the nature of the plaintiff's rights under its contract or franchise; the effect of the proposed regulation upon the operation of the bus lines, and finally, whether the franchise, in terms or by implication reserved to the city or its officials the power to alter the privileges thereby granted to plaintiff,

For fifty years prior to the granting of plaintiff's franchise street railways had been operated on Eighth and Ninth avenues, running north and south on each avenue. In 1934 the city, acting through its corporation counsel, borough president and board of estimate, and with the aid and co-operation of the police department, was seeking to work out some solution of the transportation problem created by the insolvency of the company operating these street railways. Plaintiff, on February 5, 1935, submitted an offer to operate buses along these avenues, specifying the routes and tendering a cash payment of $475,000 plus monthly payments of three per cent of the gross receipts for a ten-year franchise. Bids submitted by other parties were considered by the board of estimate, but after comparisons, plaintiff's was deemed to be most advantageous to the city, and public hearings on its application were duly held. A proposed form of franchise was prepared and hearings held thereon, following which the board of estimate unanimously

approved of the franchise and awarded it to plaintiff. The contract was executed on October 16, 1935. Plaintiff thereupon applied to and obtained from the transit commission a certificate of public convenience and necessity required by law before it could operate its bus line. Upon the issuance of such certificate, plaintiff paid to the city the sum of $475,000 required by the franchise contract. Operation over the routes began on November 12, 1935, and has continued to date. In 1937 a slight modification of Route M-41 was found advisable and it was extended southerly to Cortlandt street — about two-tenths of a mile. This was accomplished by going through the same procedure as that followed in the grant of the original franchise.

By its contract the city of New York granted to plaintiff " the franchise, right and consent to maintain and operate omnibuses for the transportation of persons for hire on routes in, upon, along and over the streets and avenues (hereinafter referred to as ' franchise, right and consent,' or ' franchise ') in the Borough of Manhattan, in the City of New York," which routes are therein described in detail. The term is for a period of ten years, subject to earlier termination by the city in the event the city shall have purchased the property and equipment of two other bus companies. By its terms the contract may not be leased, mortgaged, assigned or transferred. It requires the plaintiff to supply and operate sufficient new buses to serve the needs of the traveling public; fixes the rate of fare; requires the giving and honoring of transfers, and obligates the plaintiff to keep the route free from ice and snow. It imposes many conditions upon the coach corporation, for the failure to observe any of which the contract may be terminated by the city, and a $30,000 security fund deposited with the city forfeited.

The contract is clearly a franchise for a term of ten years, terminable prior to 1945 only by reason of plaintiff's default or the acquisition by the city of other bus lines. Neither event has occurred and the contract is in full force and effect, subject to all the terms and conditions mentioned as well as certain provisos and reservations to be hereafter noted.

Franchises such as have been granted to plaintiff constitute property. (*People* v. *O'Brien*, 111 N. Y. 1, 40.) When granted they cannot be taken away, save by the terms therein prescribed, or by due process of law. (*City of Los Angeles* v. *Los Angeles Gas & Electric Corp.*, 251 U. S. 32, 39; *Delaware, Lack. & W. R. R. Co.* v. *Morristown*, 276 id. 182, 193; *Coney Island, F. H. & B. R. R. Co.* v. *Kennedy*, 15 App. Div. 588, 593; *New York & Queens El. L. & P. Co.* v. *City of New York*, 221 id. 544.)

These cases are sufficient authority for the proposition that a franchise is a species of property that cannot be taken in **whole**

or in any substantial part by the grantor without compensation. It is true, however, that by granting a franchise the municipality does not part with its right to regulate the business conducted under the franchise where such right of regulation exists by law or is reserved to the grantor by the terms of the contract. But the right to regulate does not carry with it the right to destroy. " Under the guise of regulation, the terms of the grant cannot be substantially modified and changed or the franchise abrogated." (*Coney Island, F. H. & B. R. R. Co.* v. *Kennedy, supra.*) Legislation which tends to destroy a franchise cannot be sustained as an exercise of the right to regulate. (*Grand Trunk Western R. Co.* v. *South Bend*, 227 U. S. 544, 553.)

The evidence clearly shows that enforcement of the regulation will require one-way operation over approximately two and one-half miles of each route. In the case of the Ninth avenue line, buses will be restricted to north-bound operation, whereas on Eighth avenue operation between Fifty-seventh street and Bethune street will be south-bound only, but is permitted in both directions above and below these points. Plaintiff offered considerable proof tending to show the impracticability of profitable operation of its lines under these conditions. This evidence tended to show that the section from Fifty-ninth street south to Fourteenth street, along Eighth and Ninth avenues, represents the most heavily traveled portion of plaintiff's routes. While such proof of necessity was based on counts which may not be wholly accurate, and on opinion evidence, it supports the logical assumption that one-way operation in a busy section of this city will be bound to result in reduction of revenues. A person desiring to ride north on Eighth avenue within the affected area cannot be expected to walk a block (900 feet) to Ninth avenue and then walk back the same distance upon arriving at the cross street nearest his destination. The same holds true of a south-bound passenger on Ninth avenue. From the physical layout of the territory, which is not in dispute, and from evidence which is controverted, enough has been shown to warrant a finding that restricting plaintiff to one-way traffic between the points specified will result in a very substantial loss in passengers and revenue. It is difficult if not impossible to fix the amount of such loss to a mathematical certainty. What is certain is that plaintiff's operating income will be impaired without a corresponding decrease in operating expenses.

Defendants urge that plaintiff's proofs on this point are legally incompetent and factually inaccurate and unreliable. The proof offered consisted *first*, of testimony of company operators who took actual counts of passengers riding in the affected area and recorded

the number of fares shown on the fare box register; *second*, opinion evidence of persons of training and experience sufficient to qualify them as experts; and *third*, a survey conducted by consulting engineers who caused cards to be distributed to passengers, marked by them and collected and digested to show the number of passengers using the buses within the affected areas, their point of origin and destination, and the average length of the ride. The admission of such testimony is dictated by necessity, there being no other way to establish the probable loss of fares. The reliability of the first method above mentioned depends upon the accuracy and credibility of the employees making the count. The second method of proof is clearly competent and subject only to the same criticism to which any type of opinion evidence is open. The results shown by the third method must be accepted with caution, owing to the inherent infirmities of any poll requiring the voluntary co-operation of the public. Searching cross-examinations, while showing some errors, did not impeach the approximate reliability of the count. Allowing for a reasonable margin of error in the collection of data upon which computations of loss of passengers is based, there still remains reliable proof, augmented by the obvious probabilities, that discontinuance of north-bound buses on Eighth avenue and south-bound buses on Ninth avenue as required by the regulation will result in a substantial decrease of patronage. The estimate of twenty to twenty-five per cent appears to be well established and I am prepared to find from all the proofs that this fact has been established by the best and most accurate information available. The annual loss on this basis is estimated at between 8,500,000 and 10,000,000 passengers, and from $253,000 to $316,000 in net profits. These estimates were made by engineers of standing and repute whose qualifications are such as to induce the court to accept their computations. The accuracy and reliability of the results shown by these experts is, of course, dependent upon the original counts, but plaintiff has sustained its burden of establishing that substantial loss in revenue will result from discontinuance of two-way operation.

It follows that the proposed regulation would destroy a substantial portion of the valuable property right belonging to plaintiff. Among other conditions imposed upon it by the franchise is the obligation " to place in full operation all of the authorized routes " therein required, on penalty of forfeiture of all franchise rights. It was obligated to and has supplied " an adequate amount of safe and efficient omnibuses and equipment on the authorized routes to serve the needs of the traveling public." Should the routes left available to plaintiff under the one-way traffic regulation

prove insufficient to afford an adequate return — or any return — upon its investment for buses and equipment and the $475,000 paid to the city for its franchise, it would nevertheless be compelled either to continue to operate at a loss or inadequate return, or to forfeit its down payment as well as the additional $30,000 deposited as security under the twenty-fourth paragraph of section 2 of the franchise. Even if it could be held that plaintiff would have left a part of its franchise under which it can still operate, enough has been shown to demonstrate that a substantial portion will be destroyed, bringing it within the purview of the cases above cited holding that such rights, once granted, cannot be modified or revoked under the guise of regulation.

All this, however, does not help plaintiff if, as asserted by defendants, the contract itself contains provisions whereby the right is reserved to the city to alter the franchise by ordinances, police regulations or similar action. In support of this contention defendants point to various clauses in the contract. The first of these appears in section 1, containing the grant of the franchise. Following the detailed enumeration of the streets and avenues to be traversed is a provision that plaintiff " shall have the right to cross such other streets and avenues, named and unnamed, as may be encountered in traversing said routes, with the right to operate omnibuses in either direction over any street and avenue described in the foregoing routes, *except that said operation shall at no time be in a direction contrary to police regulations.*" *Subdivision seventeenth* of section 2 provides: " The Company shall be subject to all the laws and ordinances affecting or which may be applicable to the operation of omnibuses *and all traffic regulations applicable thereto now in force or which may be in force during the term of this contract.* The Company shall also comply with and enforce the carrying out of any lawful orders or regulations designed for the protection and safety of persons or property or for the comfort, health, and convenience of the public, which may be issued by the Board or official having jurisdiction over such matters, *and the Company shall also comply with and enforce the carrying out of such specific orders or directions with respect to the operation of omnibuses hereunder as may be issued by the Police Department of the City and which are designed to govern the movements of omnibuses in the streets.*" *Subdivision twentieth* of the same section provides: " The Company shall operate, pursuant to this contract, the routes as herein described or any portion of the same which shall best serve the convenience of the public, but the Company shall operate only upon the streets and avenues herein described. If vehicular traffic be diverted from any of the streets or avenues forming a

part of such routes because of fires, parades, traffic congestion or any other event closing any such streets or avenues temporarily or permanently to vehicular traffic, the Company may, during such closing, use such other streets or avenues as are necessary, or as may be specified by the Police Department or by the Board, to continue the operation of such routes. If, however, any such streets or avenues shall be closed to vehicular traffic for a period longer than forty-eight hours, or traffic regulations shall require a continued diversion of all or part of the operation, then the Company shall communicate with the Board and the Board may by resolution authorize the use of such other streets or avenues for the remaining period during which such streets or avenues may be closed or may designate an agent who may on certificate authorize the use of such other street or streets. The original of said certificate shall be filed with the Board and a duplicate original furnished to the Company." The final provision relied upon by defendant is contained in *subdivision thirty-second,* in which the company agrees to abide by and perform all conditions, requirements and limitations in the contract, and not to set up any claim that the provisions reserving to the city the right to terminate the franchise are unreasonable, or that any other provisions are unreasonable or void.

Do these provisions empower the defendant police commissioner to promulgate and enforce a traffic regulation which will destroy a substantial portion of the franchise without compensation or adequate substitution of routes? The answer depends upon the construction to be placed upon the quoted provisions, and that in turn requires the ascertainment of the intent of the parties as evidenced by the contract and the transactions leading up to its execution. The portions quoted cannot be interpreted without taking into consideration the contract as a whole.

It is conceded that two-way operation over these longitudinal thoroughfares was intended by both parties to the contract. The city was seeking to replace the defunct railways which had for half a century operated uptown and downtown lines on both avenues. Plaintiff offered omnibus operation as a substitute for the transportation about to be discontinued. As required by law, the board of estimate, before granting the franchise, made inquiry as to the money value thereof and fixed the payment to be made by the plaintiff on the basis of two-way operation. This clearly appears from the contract itself. The franchise describes the Eighth avenue route from Vesey street to One Hundred and Fifty-ninth street (including cross streets) as nine and six-tenths miles in length, and the Ninth avenue route from Gansevoort street to One Hundred and Twenty-sixth street as six miles. The total of

the two routes is fifteen and six-tenths miles, all of which was to be two-way operation save at either end where provision was made for running the buses around the block one way, to obviate the necessity of turning around in the avenues. The proposed regulation would reduce the fifteen miles of two-way avenue operation by eliminating five miles thereof in the best paying section and substituting therein one-way operation only. Two-way traffic over a fifteen-mile route is equivalent to thirty miles of franchise route. Compulsory one-way traffic will destroy five miles of this route, or sixteen and two-thirds per cent of the total mileage granted by the franchise. Even in the case of public grants, which are construed against the grantee, " a construction that would lead to false consequences or unjust or inconvenient results, not contemplated or intended, should be avoided." (*People ex rel. Woodhaven Gas L. Co.* v. *Deehan*, 153 N. Y. 528, 532.) It being established that two-way traffic on each route was intended by both parties and the value of the franchise fixed and paid for on that basis, the quoted sections of the contract relied upon by the defendants must be interpreted in the light of such intent. " The rule has often been declared that a contract is to be read in the light of circumstances existing at its making, and that these may avail to stamp upon a word or phrase a loose or secondary meaning as distinguished from the strict or primary meaning to be gathered from the instrument unenlightened by extrinsic aids." (*Becker* v. *Frasse & Co.*, 255 N. Y. 10, 14.) Where a literal construction of a clause tends to an unreasonable result, destructive of the main purpose of the contract, the court is required, if possible, to render a construction within the meaning and intent of the parties which is " reasonable and executable." " Words should not be taken in their broadest import when they are equally appropriate in a sense limited to the object the parties had in view. The ascertainment of the substantial intent of the parties is the fundamental rule in the construction of all agreements." (*People ex rel. N. Y. Central & H. R. R. R. Co.* v. *Walsh*, 211 N. Y. 90, 100.) It was said in the same opinion that " we must look to the contract as a whole, to the subject with which it deals, to the circumstances under which it was made and thereby determine the true intent and purpose of the parties, and if such intent and purpose is reasonably within the scope of the language used it must be taken to be a part of the contract the same as if it were plainly expressed. Indeterminate forms of expression inconsistent with the evident design of a contract are to be understood in a sense subservient to the general purposes of the contract." (211 N. Y. at p. 100. See, also, *Manson* v. *Curtis*, 223 id. 313, 320.)

Bearing in mind the intent to have two-way traffic up and down each avenue for the benefit of the public as well as for plaintiff's personal gain, the first clause cited has an obvious meaning which does not aid defendant. It follows the enumeration of the streets and avenues to be traversed and specifically provides for operation in either direction over any such streets and avenues except such operation shall not be in a direction contrary to police regulation. If this be construed to mean that when using the few cross streets named therein the buses are limited by traffic regulations, the provision is fair, reasonable and in accord with the entire plan of operation plainly contemplated by the contract. The use of cross streets is required at ten or more places along the routes, and at the terminals to expedite turning around. Obviously it would disorganize traffic to permit the buses to be operated " in either direction " over these cross streets and it is equally apparent that the quoted paragraph was designed to prevent just that and nothing more. If the clause deemed to permit the police department to change two-way traffic along the main routes to one-way traffic the provision renders the entire franchise uncertain and destroys the value of the rights granted to and paid for by plaintiff. Such an interpretation is inconsistent with the main purpose of the contract and contrary to the plain intent of the parties.

The second provision relied upon by defendants is *subdivision seventeenth* of section 2. This section of the contract provides that " the grant of this franchise is subject to the following conditions, provisions, requirements and limitations contained in the following subdivisions: " Then follow thirty-five subdivisions covering such matters as the term of the franchise; compensation to be paid by the grantee; restrictions upon alienation of the grant; securing of certificate of necessity by the grantee from the transit commission; obligation of the grantee to furnish omnibuses and detailed specifications of such buses; fares permitted to be charged, exchange of transfers; keeping streets clear of snow and ice; keeping of records and inspection by the city; assumption of liability for damage suits and deposit of security, etc. Subdivision seventeenth, above quoted in full, consists of two paragraphs, the first of which subjects the company to all laws and ordinances and to all traffic regulations applicable to omnibus operation in force during the contract term. As in the case of the clause just above construed, it follows that if this paragraph requires the plaintiff, in operating its buses north and south on Eighth avenue and north and south on Ninth and Columbus avenues, to comply with all laws, ordinances and traffic regulations *applicable to such operation*, the paragraph in question is reasonable and in conformity with the general

purposes of the agreement. If, however, it is interpreted to mean that the two-way operation contemplated by the parties and specifically contracted for may be destroyed in its entirety or in a substantial part by the city acting through one of its departments, the paragraph renders the entire contract indefinite and destroys the rights plaintiff contracted for and the city intended to grant to it.

The second paragraph of subdivision seventeenth falls within the same category. It requires the company to obey and enforce lawful orders designed for the comfort, health and safety of the public. This is not pertinent to the subject at hand. It also requires plaintiff to comply with *specific* orders issued by the police department with respect to the operation of buses and designed to govern their movements in the streets. Such a provision in a franchise granting the right to operate north and south on each avenue can relate only to the regulation of the movements of buses while being so operated. It does not include the right to refuse to permit the operation contracted for.

All the provisions thus far relate solely to the right to regulate the movements of buses while being operated as contemplated by the franchise, namely, in both directions along each of the avenues. In *subdivision twentieth* we find for the first time provision for operation in the event any portion of the specified routes is closed to traffic for any of the reasons there specified. The subdivision requires the company to operate the routes as described in the franchise, or any portion of the same which shall best serve the convenience of the public, but only upon the streets and avenues named. (Elsewhere in the franchise the company is obligated, under penalty of forfeiture of all rights, to place in full operation *all* of the authorized routes. § 2, subd. fifth.) It then provides that if vehicular traffic be diverted from any of the streets or avenues " because of fires, parades, traffic congestion or any other event closing any such streets temporarily or permanently to vehicular traffic the Company may, during such closing," use such other streets as may be necessary, or as may be specified by the police department, *to continue the operation of its routes.* If, however, such streets shall remain closed longer than forty-eight hours, or traffic regulations shall require a continued diversion of all or part of the operation, the company shall apply to the board of estimate, which *may* authorize the use of such other streets for the *remaining period* during which the streets are closed. The main purpose of this subsection is to provide for *temporary* diversion when necessitated by emergencies beyond the control of either party. The temporary character of the provisions is not altered

by the use of the word "permanent" in a single instance. Their physical position in the instrument refutes any inference that they were intended to modify the grant of two-way operation on the avenues constituting the main routes contracted for. One-way traffic on Eighth and Ninth avenues was never within the contemplation of either party at the time the franchise was granted, and neither party intended by the provisions of this subdivision to curtail two-way operations along those avenues save temporarily in cases of emergency. The provisions here set forth are designed merely to protect the company in the use of streets not specifically covered by its franchise during temporary diversions from its routes due to emergencies. This is necessitated by the provisions of the Public Service Law and Transportation Corporations Law, which render illegal the operation of buses over routes not described in the charter of the operating company and for which it possesses no franchise from the municipality. To interpret this subdivision as permitting the police department to nullify the provisions of the franchise is to do violence to the plain import of the contract and the intent of the parties. "The terms of the  *  *  * · contract were drafted in such form as deliberately to exclude any possibility of modification." (*City of New York* v. *Interborough R. T. Co.*, 257 N. Y. 20, 35.)

It may be observed that the proposed police regulation specifies that it is "for a temporary period of 30 days." Concededly, however, this period is intended as a trial preliminary to a permanent regulation of like effect, or at least for the duration of the World's Fair. Thirty days would entail a financial loss to plaintiff only in a lesser degree than a permanent regulation. It would disrupt its service and presumably cause a loss of patronage it could not regain if at some future time the police commissioner decided to restore two-way traffic.

The only other provisions of the franchise pointed out upon the trial or in the briefs as justifying the proposed action or prohibiting plaintiff from objecting thereto are those found in the thirty-second subdivision. On examination this clause is found to contain an agreement by plaintiff that it will abide by all the conditions and limitations of the contract and will not assert that they are unreasonable or void. No such contention is being made herein by the coach corporation.

Construing the contract as a whole, in the light of the intent of the parties to provide public transportation facilities in both directions along Eighth and Ninth avenues, it is clear that the foregoing provisions were not intended to and actually do not permit the city or its officials to curtail the operations contemplated

by the parties and specifically enumerated in the written agreement prepared by the defendant. When we consider all the formalities involved in the submission of a written bid and petition for a franchise, the public hearings on routes and on the form of the agreement, the investigations to fix the value of the franchise, based upon the routes therein specified, the investigations by the police department to ascertain the best routes to accommodate public requirements with the least interference with traffic, the execution of a carefully prepared contract, the applications to the transit commission for certificates of convenience and necessity, the payment by plaintiff of $475,000 for a ten-year franchise and its investment of large sums to procure buses adequate to provide for the service contemplated at the time, it appears incongruous that all this could be changed by the regulation of the police commissioner, who is not one of the contracting parties. " It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may properly be taken into consideration." (*Fleischman* v. *Furgueson*, 223 N. Y. 235, 241.) I hold that it was not the intent of the parties nor the purport of the several subdivisions to make the terms of franchise dependent upon police regulation.

Defendants' counsel lays great stress upon the decision of the Court of Appeals in *Jones Beach Boulevard Estate, Inc.*, v. *Moses* (268 N. Y. 362). In that case the plaintiff, an abutting owner, attempted to restrain the parkway commission from enforcing an ordinance prohibiting turns across the parkway except at designated points. Plaintiff had conveyed strips of land to the commission, reserving to itself the right of access to the paved portions of the parkway. There was no difficulty in reaching the parkway from plaintiff's premises, but once there, a vehicle desiring to proceed westerly was required by the ordinance or regulation to first proceed easterly a matter of several miles before reaching a point where it could make the turn to proceed to its desired destination. In upholding the validity of the regulation the Court of Appeals pointed out that the plaintiff *reserved* to itself only such rights as the traveling public possessed. There was no *grant* of any right by the parkway commission. In the case at bar we are dealing with contract obligations wherein specific rights were granted. Neither the facts in the *Jones Beach* case nor the principle upon which it was decided are relevant here.

It is impossible, even in an opinion of such inordinate length as this has proven to be, to note each and every argument and reason urged upon the trial, the oral arguments and in the numerous briefs submitted to me. It is with great reluctance that I reach a deci-

sion that will in any way interfere with the city officials in their earnest attempt to solve one of the many vexatious problems with which they are faced. It is neither the province nor the desire of this court to substitute its judgment for that of the officials to whom it is delegated by law. While one-way avenue traffic is a novelty in this city, this court would not presume to pronounce it unwise or stay its operation if it did not, as I am convinced it does in this case, destroy contract rights granted by the city itself and for which plaintiff has paid a consideration measured by full operation of the specified routes. Although it appears that prior to 1936 the police department, after surveys made by its traffic bureau, reported against one-way traffic on longitudinal avenues, such operation now appears to be favored by it. Save for plaintiff's legal rights, it would not be within the power of this court to interfere with the power delegated to the department, or to hold that one-way traffic is neither beneficial nor desirable. Certainly upon the record before me I cannot hold with any degree of assurance that one-way operation would fail to speed up traffic and eliminate danger of accidents. It is not my province to decide that issue and I specifically refrain from so doing. It is a matter for the authorities having supervision of traffic.

Nor do I wish to be understood as holding that plaintiff's contract rights of necessity prevent the proposed change in traffic regulations prior to the expiration of the franchise. Like any other species of property or rights it may be acquired or extinguished in a proper proceeding which provides compensation for what is taken. I merely hold that the result sought cannot be accomplished by the summary method here presented. For that reason, the proof before me justifies judgment against the police commissioner alone, there being no evidence that the city, its mayor or its board of estimate have taken or are threatening to take any steps to curtail plaintiff's rights. They should be and are left free to discharge their official duties without judicial interference. Plaintiff coach corporation is entitled to judgment restraining the police commissioner from enforcing the proposed ordinance published in the *City Record* on March 26, 1938, or any ordinance of similar terms affecting the avenues therein specified, so long as plaintiff's present franchise remains in force and effect, with permission to the police commissioner to apply at the foot of the judgment herein at any time for relief from the terms of such judgment in the event changes of conditions and circumstances render inapplicable anything herein decided.

The taxpayer's action stands on a wholly different basis. To recover, he must show illegality and waste. (*Campbell* v. *City of*

*New York*, 244 N. Y. 317, 328.) So long as the judgment in the coach corporation's action stands, the taxpayer is in no need of injunctive relief. He has no contract rights to protect and by reason of that fact the *Jones Beach* case is in a measure applicable here. The rights of abutting owners herein are similar to those of the plaintiff in the *Jones Beach* case, wherein it was held that although such an owner might be inconvenienced by the one-way regulation, he has no remedy if such regulation be reasonably adapted to benefit the traveling public.

As stated in the *Campbell* case (*supra*), " courts do not sit in judgment upon questions of legislative policy or administrative discretion. The taxpayer must point to illegality or fraud." (244 N. Y. at p. 328.) There is no fraud here, and the only illegality shown is the threatened acts in violation of the coach corporation's contract rights. If my decision in the companion action is upheld, there will be no waste and no violation of the rights of the coach corporation nor of any claimed rights of the abutting owners, merchants or the traveling public. If the appellate courts hold that the police regulation is valid, enforcible and not in violation of the coach corporation's rights, there will be no waste, for the corporation would not be legally damaged under such a decision.

The evidence introduced by plaintiffs tended to establish that making Eighth and Ninth avenues one-way thoroughfares would so increase the traffic loads as to create a condition dangerous to the public; increase the hazards of pedestrians crossing the streets and the dangers of collision between cars making turns into the avenues and into the side streets; decrease the number of passengers using the buses and thereby diminish the financial returns of both the city and the plaintiff; cause great inconvenience to prospective passengers by requiring them to travel a greater distance to board a bus traveling in the desired the direction; and reduce the income of storekeepers on the avenue and the rental values of the abutting property.

The city's evidence was to the effect that the one-way regulation would increase the flow of traffic and at the same time reduce the cause of accidents; that the danger of head-on collisions would be abolished and accidents caused by right and left turns would be minimized; abolish the danger of glaring headlights and enable the city to introduce a progressive lighting traffic signal system.

Between these conflicting claims the court need not decide. The taxpayer is obligated to show a clear right of recovery wholly independent of any contract rights. He must establish the illegality of acts complained of, and the resultant damage to the municipality, His proof tends to establish inconvenience to the traveling public,

to abutting owners, and to merchants in the affected area. All this is due to a police regulation which, so far as these people are concerned, the police commissioner has the power and authority to make and enforce. (Former charter, § 315; present charter, § 435; *Cherubino* v. *Meenan*, 253 N. Y. 462.) Except where express contract rights are involved, the court cannot sit in judgment on the wisdom of the regulation. This is a matter delegated by law to the proper city department. Unless unreasonable, the courts will not interfere. (*Jones Beach* case, *supra*, at p. 368.) A regulation adopted to speed up traffic and eliminate danger is reasonable and one-way traffic regulation is now considered a reasonable and proper method of securing these ends. (*Commissioners of Palisades Interstate Park* v. *Lent*, 240 N. Y. 1, 8.)

For the reasons herein set forth, judgment is granted in favor of the plaintiff coach corporation against the defendant police commissioner to the extent above stated, and in favor of all defendants against the plaintiff taxpayer. Submit decisions and judgments in accordance herewith.