Louis **MOORER**, Appellant,

v.

**STATE OF SOUTH CAROLINA and Ellis C. MacDougall, Director, South Carolina State Board of Corrections, Appellees.**

No. 10526.

United States Court of Appeals Fourth Circuit.

Argued May 30, 1966.

Memorandum and Order July 18, 1966.
Opinion Filed Sept. 26, 1966.

See also, 4 Cir., 347 F.2d 502.

Jack Greenberg, New York City (Norman C. Amaker, James M. Nabrit, III, Michael Meltsner, New York City, Matthew J. Perry, Columbia, S. C., and F. Henderson Moore, Charleston, S. C., on the brief) for appellant.

E. N. Brandon, Asst. Atty. Gen. of South Carolina (Daniel R. McLeod, Atty. Gen. of South Carolina, and Julian S. Wolfe, Sol., First Judicial Circuit, on the brief) for appellees.

Before SOBELOFF, BOREMAN and J. SPENCER BELL, Circuit Judges.

MEMORANDUM and ORDER

PER CURIAM:

On August 18, 1965, the District Court conducted a hearing on a petition by Louis Moorer for a writ of habeas corpus. Moorer, a Negro, is under sentence of death after conviction in a jury trial in a South Carolina state court for the rape of a white woman.

In support of his petition he alleges, *inter alia*, that in South Carolina the death penalty for rape has been applied in a racially discriminatory manner. On the day of the hearing, counsel for Moorer sought a 60-day extension in order to produce statistical analysis of 355 schedules which detail the circumstances of rape cases in South Carolina from 1945 to 1965. The District Court denied the extension. Attorneys for the appellant then offered to introduce into evidence the 355 schedules. The District Court refused to admit the documents, but took them into custody and ordered them sealed and subject to removal or copying only upon good cause shown. On August 23, 1965, counsel for appellant filed a motion for leave to withdraw the 355 schedules, and a hearing on the motion was held on October 4, 1965. The District Court has not yet issued a ruling, but the documents have been forwarded to this court with the record on appeal.

The schedules are the product of a study initiated by appellant's counsel in 1965 to examine in eleven states the circumstances in which the death penalty

was imposed in rape cases.* Under the guidance of Professor Anthony Amsterdam of the Law School of the University of Pennsylvania and Professor Marvin Wolfgang, graduate chairman of the Department of Sociology of the University of Pennsylvania, questionnaires were framed to elicit, in addition to data appearing in court records, all "available and known factors which * * * are likely to affect the discretion of jurors and executive officials in sustaining or modifying a sentence imposed upon one convicted of rape." (Affidavit of Professor Wolfgang.) Twenty-eight law students volunteered to conduct the supplemental field research, and were briefed at the University of Pennsylvania on the legal and methodological aspects of the study, instructed extensively on the methods of gathering and recording data, and thoroughly familiarized with the schedule to be used. They then spent from ten to twelve weeks during the summer of 1965 conducting the survey. The affidavits submitted with the motion recite that state officials and local private attorneys were found cooperative in their responses. The affidavits further show that "[b]ecause of the voluminous and complex nature of the data whose examination is required in order to arrive at such valid and reliable conclusions, considerable time is needed for analysis before even preliminary opinions can be formed concerning the effect of race on capital sentencing and executions in the State of South Carolina."

After the District Court denied on its merits the petition for a writ of habeas corpus, Moorer appealed, and as a preliminary matter his attorneys urged this court to order the release of the 355 schedules so that they might be statistically analyzed.

■ Because the schedules constitute the work product of the attorneys for the appellant and of other responsible parties, and because the information contained in them might prove useful in this and other litigation, and because there appears no reason for withholding these documents from the attorneys,

It is now hereby ordered that the Clerk of this court release the 355 schedules and deliver them to counsel for the appellant. The court intimates no opinion on the merits of the case and retains jurisdiction of the appeal.

OPINION

SOBELOFF, Circuit Judge.

■ Louis Moorer is currently under sentence of death imposed by the General Sessions Court of Dorchester County, South Carolina, following his 1962 conviction for rape. After exhausting all available state remedies,[1] he petitioned the District Court for a writ of habeas corpus, which was denied without a hearing. After a hearing ordered by this court,[2] the petition was again denied, and Moorer appeals. Because the jury at his state trial was apprised of an inculpatory statement taken from Moorer after his arrest, but was given no opportunity to determine the voluntariness of the statement, we reverse. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L. Ed.2d 760 (1961).

In the course of Moorer's trial, a deputy sheriff testified in the jury's presence that he had been at a "conference" during which Moorer made a statement. In response to the prosecuting attorney's questions, the deputy stated that no threats, promises, or force

---

* The eleven states chosen were those in which there had been any significant number of executions for rape in recent years.

1. See Moorer v. MacDougall, 245 S.C. 633, 142 S.E.2d 46 (1965); Moorer v. State, 244 S.C. 102, 135 S.E.2d 713, cert. denied, 379 U.S. 860, 85 S.Ct. 119, 13 L. Ed.2d 63 (1964); State v. Moorer, 241 S.C. 487, 129 S.E.2d 330 (1963).

2. Moorer v. State of South Carolina, 347 F.2d 502 (4th Cir. 1965).

had been used to procure the statement, and that it had been given "freely and voluntarily."[3] The prosecutor then offered the statement in evidence, but the trial judge excluded it after defense counsel objected that Moorer had not been advised of his right to counsel during the "conference."[4]

The prosecutor then called the County Sheriff, who reiterated the deputy's testimony and stated specifically that Moorer had been advised of his right to counsel.[5] Again the trial judge refused to admit the statement. After the jury retired from the courtroom, the trial judge explained that he had excluded the statement, not on constitutional grounds but only because the state's version of the facts of the crime itself had not been contradicted, and there was "no necessity of injecting into this record something that the Court might consider prejudicial."[6] At the close of the trial, the jury was given no instruction concerning the testimony that Moorer had made a statement to the police; nor were they told that in order to consider the statement they must initially determine whether it had been made voluntarily.

The net effect of these proceedings before the jury was to inform it that the defendant had made a statement, the details of which were not disclosed but which the prosecutor was obviously desirous of making a part of his case. At the oral argument in this court, the Assistant Attorney General of South Carolina, with commendable candor, acknowledged that, while the precise contents of Moorer's statement were not disclosed at the trial, the jury must have been made aware by the officers' testimony that it contained incriminating admissions. Thus, despite the exclusion of the statement itself, the effect was the same as if the jury had been told that Moorer had confessed.

3. "Q. Did Louis Moorer make a statement to you and the Sheriff and others?
   A. Yes, sir.
   Q. Was that statement made freely and voluntarily?
   A. Yes, sir.
   Q. Did you offer him any hope of reward?
   A. No, sir.
   Q. Did you try to force him to talk?
   A. No, sir.
   Q. Did he talk voluntarily?
   A. Yes, sir.
   Q. Did you tell him of his rights?
   A. Yes, sir.
   *       *       *       *       *
   Q. As a result of talking with Louis Moorer was a statement procured from him?
   A. Yes, sir."

4. Apparently anticipating Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. "A. * * * I questioned the suspect, Louis Moorer, in the jail.
   Q. Did he talk freely and voluntarily?
   A. Yes, sir, I told him his rights. I told him that he had the right to get counsel and I also told him that any statement that he made, oral or written, would be used against him as evidence in the court.
   *       *       *       *       *

   Q. As a result of that, then, Sheriff, did he talk to you freely and voluntarily?
   *       *       *       *
   A. Yes, sir, he did.
   *       *       *       *       *
   Q. Was that statement reduced to writing?
   A. Yes, sir."

6. The court said: "Well, there is no question, so far, nobody in the slightest has cast any question upon [the victim's] testimony. The defense counsel has not asked her a question. There has been no denial of it at the present time. Now I don't see any sense in offering in something that is always available as to whether a confession is made, when nobody, so far as I know, has questioned the testimony of Mrs. Johnston. * * * It may become competent. If it is contradicted, or any attempt to contradict it—but I see no necessity of injecting into this record something that the Court might consider prejudicial."

   The Judge's comment is a wise admonition to overzealous prosecutors who often endanger strong cases by the introduction, directly or indirectly, of constitutionally doubtful evidence. See Haynes v. State of Washington, 373 U.S. 503, at 519, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

In Jackson v. Denno, 378 U.S. 368, 376–377, 1780–1781, 84 S.Ct. 1774, 12 L.Ed.2d 908, the Supreme Court noted:

"It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction. [Citations omitted.] *Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession.* Rogers v. Richmond, supra." (Emphasis added.)

Here, notwithstanding the jury's knowledge that the defendant had made an incriminating statement, they were not asked to determine whether it was involuntary, and the trial judge expressly declined to pass on the question. Plainly, this constituted a denial of his right to "a fair hearing in which both the underlying factual issues and the voluntariness of his confession are *actually* and reliably determined." Id. at 380, 84 S.Ct. at 1783.[7] (Emphasis added.)

In *Jackson,* the Court limited the relief to ordering an independent hearing in the state court on the admissibility of a confession, for there the confession had been admitted and the jury credited it. Here, not only was the voluntariness of Moorer's statement not passed on by the Judge or the jury, but the jury at no time had the statement itself—only some conjecture of its contents. There is therefore no way of judging the extent of the possible prejudice to the defendant from the oral reference to "a statement." Conceivably the statement could have contained intrinsic evidence bearing on the nature and circumstances of the crime which might have influenced the jury in determining whether to recommend mercy. The only proper course therefore is to order a new trial. The order of the District Court is reversed with directions to grant the writ of habeas corpus releasing the appellant unless the State of South Carolina will grant him a new trial. If the State wishes to use the confession at the new trial it will of course observe the procedure for determining voluntariness prescribed in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. See also Gibson v. United States, 363 F.2d 146 (5 Cir. 1966).

This disposition is without prejudice to Moorer's right to pursue any other challenges to his conviction which may still be available to him. Both here and at the District Court hearing, counsel for Moorer argued, *inter alia,* that where Negroes are convicted of raping white women the death penalty is imposed in a discriminatory manner, and offered certain statistical surveys to show that racial considerations are the primary factor in the jury's decision whether or not to recommend mercy.[8] We do not now decide either the relevancy of this evidence[9] or its admissibility as an excep-

---

7. No retroactivity problem is presented here, since a defendant's right to a hearing on—and determination of—voluntariness antedates Moorer's 1962 trial, e. g., Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), and earlier cases cited therein, and because the Supreme Court itself has indicated that Jackson v. Denno is retroactive. See Linkletter v. Walker, 381 U.S. 618, 628 n. 13, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

8. See Memorandum and Order in the present case published in conjunction with this opinion.

9. The Supreme Court recently granted certiorari to consider this issue. Sims v. Georgia, 384 U.S. 998, 86 S.Ct. 1953, 16 L.Ed.2d 1013 (1966).

tion to the hearsay rule,[10] since those questions are not necessary to the present decision.

Reversed and remanded.

---

10. On the question of public opinion polls and statistical evidence as "necessity" exceptions to the hearsay rule, see generally Eighth Avenue Coach Corp. v. City of New York, 170 Misc. 243, 10 N.Y.S.2d 170 (N.Y.County Ct.1939), aff'd mem. 259 App.Div. 870, 20 N.Y.S.2d 401 (1940), aff'd 286 N.Y. 84, 35 N.E.2d 907 (1941); American Luggage Works v. United States Trunk Co., 158 F.Supp. 50 (D. Mass.1957) (Wyzanski, D.J.), aff'd sub nom. Hawley Products Co. v. United States Trunk Co., 259 F.2d 69 (1st Cir. 1958); United States v. 88 Cases, More or Less, Containing Birelly's Orange Beverage, 187 F.2d 967, 974 (3d Cir. 1951), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1952). Cf. Rule 43(a) Fed.R.Civ.Proc.